# UNITED STATES *v.* BLACKFEATHER.

## APPEAL FROM THE COURT OF CLAIMS.

No. 622. Argued October 24, 25, 1894. — Decided November 19, 1894.

This court is not called upon to consider errors assigned by an appellee who has taken no appeal from the judgment below.

The findings of the court below touching the expenditures by the United States to support and keep a blacksmith for the use of the Indians are too indefinite to allow them to be made the subject of a set-off.

The United States having undertaken by Article VII of the Treaty of August 8, 1831, with the Shawnees to " expose to public sale to the highest bidder " the lands ceded to them by the Shawnees, and having disposed of a large part of the same at private sale, were thereby guilty of a violation of trust; and as all public lands of the United States were, by the act of April 24, 1820, c. 51, 3 Stat. 566, made open to entry and sale at $1.25 an acre, the measure of damages for the violation is the difference between the amounts realized, and the statutory price.

Under the provisions of said treaty the Shawnees were entitled to interest on such damages as an annuity.

The United States is not responsible to the Shawnees for moneys paid under a treaty to guardians of orphans of the tribe, appointed by the tribal council, who had embezzled the money when so paid.

Whether the Shawnees are entitled to recover in these proceedings money embezzled by an Indian superintendent, *quære.*

There was no error in the action of the court below ordering a percentage allowance to counsel.

THIS was a claim by the Shawnee tribe of Indians under a special act of Congress passed October 1, 1890, c. 1249, 26 Stat. 636, conferring jurisdiction upon the Court of Claims, subject to an appeal to this court, to hear and determine the just rights in law or in equity of the Shawnee and Delaware Indians under certain treaties with the government.

The fourth section of the act authorizes the Shawnees to bring suit to recover " any amount of money that in law or equity is due from the United States to said tribes in reimbursement of their tribal fund for money wrongfully diverted therefrom."

The original petition in the case was filed December 10, 1890. An amended petition was filed by leave of the court February 3, 1891, to which the defendants filed a traverse.

On July 6, 1892, an amended and supplemental act of Congress was passed, c. 151, 27 Stat. 86, authorizing the Shawnees to present to the Court of Claims · " all their claims against the United States and the Cherokee Nation, or against either or both of them, of every description whatsoever, arising out of treaty relations with the United States, rights growing out of such treaties, and from contracts, expressed or implied, under such treaties, made and entered into by and between the said Shawnees and Cherokees, and between them or either of them, and the United States."

Subsequently, on July 21, 1892, the appellee filed a second amended petition in the Court of Claims, introducing claims not embraced in the former petition.

The United States interposed a general denial of the allegations of the petition and also made a counter-claim of $12,182.03, alleged to have been overpaid, under a treaty of 1825.

The case having been heard by the Court of Claims, the court, upon the evidence, made the following findings of fact:

I. The following is the Spanish grant to the Shawnee Indians, to which reference is made in the preamble of the treaty between the United States and the Shawnees in Missouri, proclaimed December 30, 1825:

" Delawares and Shawnees, claiming a tract of country

between the river St. Coure and Cape Gira'deau, and bounded on the east by the Mississippi and west by the White Water, district of Cape Gira'deau, produced to the board as follows, to wit:

" The Baron de Carondelet, knight of the faith of St. John, colonel of the royal armies, governor intendant-general, sub-prefect of the provinces of Louisiana, west Florida, and inspector of their troops etc. Be it known by these presents, that in consideration o the good and faithful services that the said Louis Lorimer has rendered to the State since he has been a subject of his Catholic Majesty, we allow him to settle with the Delaware and Shawnee Indians who are under his control in such places as he may select in the province of Louisiana, on the right bank of the Mississippi, from the Missouri to the Arkansas River, which may have no governor, and both to hunt and plant thereon for the support of their families, and no commandant, officer, or king's subject shall have the power to oppose him in occupying the lands by him and the said Indians sown, planted, or settled, so long as they shall think proper to abide there; provided, in case they abandon them to move elsewhere they will be considered as vacant; and as for the house that the said Sir Louis Lorimer built at Cape Gira'deau, it shall remain in his possession, not to be taken from him for any reason except the sole ones of illicit commerce or corresponding with the enemies of the State.

" Wherefore we have given these presents, signed by our hand, and countersigned by the secretary of this government, and to which we have caused the seal of our arms to be affixed at New Orleans, on January 4, 1793.

" LE BARON DE CARONDELET.

" By order of his lordship."     " ANDRES LOPEZ ARMESTO.

II. The M ssouri band of Shawnees have received payments in accordance with the provisions of the treaty of 1825, but the following balance remains unpaid, $1152.78.

III. The lands which the treaty of 1831, between the United States and the Ohio band of Shawnees, ceded to the defendant herein, were received and sold. Of these lands,

between December 24, 1832, and December 31, 1832, 9841.27 acres were sold at public sale to the highest bidder at the rate of $2.08¾ per acre; the total amount received for these lands is shown in Finding VI. The rest of the land so ceded was sold at private sale at the rate of $1.25 per acre. Some of the land sold at this rate of $1.25 per acre had improvements upon it; but most of the land so sold was unimproved. The lands were sold with reasonable expedition; the last sale was June 30, 1840. The total amount of the lands ceded was 96,051.48 acres.

The amount of land to be reserved to Francis Duchouquet (article 11, treaty of 1831) was 320 acres.

The amount of land to be reserved to Joseph Parks (article 13) was 640 acres. The amount of land the price of which was to be reserved to the Michigan Shawnees (article 13) was 640 acres.

IV. Whether the Shawnees, who, in 1831, resided on the River Huron, Michigan, have expressed a desire to follow the Shawnees of Wapaghkonnetta to their residence west of the Mississippi does not appear; nor does it appear that they have expressed a desire not to do so. Their wishes upon this subject are not disclosed.

V. Out of the proceeds of the land sales in Ohio the United States has retained (at 70 cents per acre) the amount shown in Finding VI; also $6994.40, the cost of the grist-mill and saw-mill; also $1011, the cost of surveying; also $13,000 for improvements.

VI. The following is the account between the United States and the Shawnee tribe under treaty of 1831:

Total amount of land ceded (acres)............... 96,051.48
    Less:
Reserved for Joseph Parks................... 640.00
   "   " Francis Duchouquet.......... 320.00
   "   " Hurons (the price to be held as
    shown in treaty).................. 640.00
Difference between plats and abstracts..... 5.43
                                                  1605.43
       Acres............................... 94,446.05

Of these acres there were sold, at $2.08¾ per acre, 9841.27 acres, yielding $20,543.65.

There remained (acres) 84,604.78, which, at $2 per acre, would have yielded $169,209.56; adding this to the $20,543.65 gives a total of $189,753.21.

There has been paid to the Shawnees:

| | | |
|---|---:|---:|
| Per 5th article treaty of 1831 | $13,000 | 00 |
| " 4th " " " " | 6,994 | 00 |
| " 7th " " " " (surveying) | 1,011 | 00 |
| Amount retained from sales, at 70 cents per acre | 66,252 | 23 |
| Total | $87,257 | 63 |
| From the amount due as shown above | $189,753 | 21 |
| Subtract | 87,257 | 63 |
| Balance (in 1840) | $102,495 | 58 |
| Paid to the Shawnees (September 28, 1852) under the 7th article of the treaty of 1831 | $37,180 | 58 |
| Interest on $102,495.58 from June 30, 1840, to June 12, 1893, at 5 per cent | $271,357 | 04 |
| Interest on $37,180.58 from September 28, 1852, to June 12, 1893, at 5 per cent | 75,672 | 80 |
| Difference | $195,684 | 24 |
| Subtract amount paid | 37,180 | 58 |
| Balance | $158,503 | 66 |
| Add (see *supra*) | 102,495 | 58 |
| Total | $260,999 | 24 |
| Add amount unpaid under treaty of 1825 | 1,152 | 78 |
| Total | $262,152 | 02 |

VII. Difficulties arose as to the 100,000 acres which the second article of the treaty of 1831 provided should be given the Indians, and the United States failed to perform their stipulation in this regard; because of this failure the United States paid the Ohio Shawnees $66,246.23, and received receipts stating that the moneys thus paid were "in full payment of all claims under that part of the treaty of 1831 which has relation to the grant of 100,000 acres of land in fee simple to

the Ohio Shawnees." It does not appear that the amount so paid the Ohio Shawnees was insufficient compensation.

VIII. Owing to laches or dishonesty, certain moneys due to orphan children under the treaty of 1854 with the Shawnees, to be distributed under the last clause of article 8 thereof, was lost to them. The President deemed best to pay their money over in severalty. The Shawnee Council created certain so called guardians of the orphan children, and to them the defendants paid a portion of the orphans' money, which by laches or dishonesty never reached the orphans. Another portion of the orphans' money was committed to a United States Indian superintendent for distribution; he embezzled it, and this money was lost to the orphan children.

The total amount lost to the orphan children in the manner above set forth was $10,506.39. On this amount the United States recovered from the Indian superintendent's sureties $1068.77, and in 1884 appropriated the balance, $9437.62, but no payment has been made, as the Secretary of the Interior and Commissioner of Indian Affairs deemed that the whole amount of the money should not go to the Shawnees as a tribe, but a part at least " should be paid directly to the parties to whom it belongs."

IX. There was paid the Shawnees for blacksmiths from 1825 to 1854 the sum of $17,408.73.

Upon these findings, the Court of Claims entered a decree to the effect that there was due to the Shawnees from the United States on June 12, 1893, the date of the decree, principal and interest, the sum of $262,152.02, and the further sum $10,506.39, due to certain infant Shawnees, which was ordered to be paid to said orphans or their personal representatives under the direction of the Secretary of the Interior. It was further ordered that there be paid to counsel for the Shawnees as compensation the sum of $26,215, which does not exceed ten per cent of the amount recovered by said Indians, and which is to be paid out of and deducted from the said abovementioned sum of $262,152.02. The opinion of the court is reported in 28 C. Cl. 447.

From this judgment the United States appealed to this court.

*Mr. Assistant Attorney General Dodge,* (with whom was *Mr. Charles W. Russell* on the brief,) for appellants.

*Mr. Charles Brownell* for appellee.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

As the claimant took no appeal from the judgment of the court below, of course we are not called upon to consider the numerous errors assigned in his brief to its action in refusing to make certain allowances claimed in his petition. *The Stephen Morgan,* 94 U. S. 599. We are concerned only with the appeal of the government from the allowances actually made, and shall limit our decision to the errors assigned by the Attorney General in his brief.

1. Prior to December 30, 1825, a portion of the Shawnee Indians were individually and collectively in possession of a tract of land about twenty-five miles square near Cape Girardeau in the State of Missouri, under a permit from the Spanish government, granted to them on January 4, 1793, by the Baron de Carondelet. A translated copy of this grant constitutes the first finding of the court below. This tract of land was acquired by the United States under the treaty of cession with the French Republic of April 30, 1803, 8 Stat. 200, commonly known as the "Louisiana Purchase." The sixth article of this treaty obligated the United States to carry out such treaties and articles as might have been agreed upon between Spain and the Indian tribes, until by mutual consent of the United States and said tribes other suitable articles should be agreed upon.

On November 7, 1825, a treaty was made by the United States with these Indians, 7 Stat. 284, under which the Indians ceded to the United States the lands in question, in consideration of which the United States agreed to give to the Shawnees residing within the State of Missouri, " for themselves and for those of the same nation, now residing in Ohio, who may hereafter emigrate to the west of the Mississippi, a tract of land equal to fifty miles square, situated west of the Missouri, and within the purchase lately made

from the Osages." The United States further agreed to make certain payments in money to the Shawnees as an equivalent for the loss and inconvenience which the tribe would sustain by removal, to enable them to obtain supplies, and to satisfy certain claims made against citizens of the United States for spoliations. It appears that the Shawnees received payments under this account, but the second finding of the court is that a balance remains unpaid of $1152.78. · As this is a finding of fact upon the evidence, it is not controverted by the government, and no error is assigned to its allowance. The claim of the appellees that interest should have been allowed upon this residue cannot be considered, as no appeal was taken from such refusal.

The only question connected with this branch of the case arises from a counter-claim by the government, under the fourth article of the treaty, by which the government undertook to support and keep a blacksmith for the use of the Indians on the land thereby assigned to them, for the term of five years, " or as long as the President may deem it advisable; and it is further stipulated, that the United States shall furnish for the use of the Shawnees, the tools necessary for the blacksmith's shop and (300) three hundred pounds of iron annually, to be furnished at the expense of the United States." The court finds that there was paid the Shawnees for blacksmiths from 1825 to 1854 the sum of $17,408.73. As there is no finding how much of this sum was expended during the five years, or the extended period deemed "advisable" by the President, during which the government was bound to keep up the blacksmith shop, the finding is too indefinite to be made the subject of a set-off. Indeed, for all that appears, the President may have deemed it advisable to continue the shop until 1854. His discretion was absolute as to the time the shop should be continued. We can only say that, as the shop was established and equipped *under* the treaty, it was probably continued under the discretion vested in the President *by* the treaty. It is clear that the amount expended is not available as a set-off.

2. The second and principal assignment of error arises

from an allowance of the sum of $260,999.24, based upon a treaty made August 8, 1831, 7 Stat. 355, with a branch of the Shawnees residing in Ohio, under which they ceded to the United States their lands in Ohio, the government agreeing to give in exchange certain lands upon the western side of the Mississippi.

The seventh article of the treaty provided as follows:

" The United States will expose to public sale to the highest bidder, in the manner of selling the public lands, the tracts of land herein ceded by the said Shawnees. And after deducting from the proceeds of such sale the sum of seventy cents per acre, exclusive of the cost of surveying, the cost of the gristmill, sawmill, and blacksmith shop and the aforesaid sum of thirteen thousand dollars, to be advanced in lieu of improvements; it is agreed. than any balance, which may remain of the avails of the lands, after sale as aforesaid, shall constitute a fund for the future necessities of said tribe, parties to this compact, on which the United States agree to pay to the chiefs, for the use and general benefit of their people, annually, five per centum on the amount of said balance, as an annuity. Said fund to be continued during the pleasure of Congress, unless the chiefs of the said tribe, or band, by and with the consent of their people, in general council assembled, should desire that the fund thus to be created, should be dissolved and paid over to them; in which case the President shall cause the same to be so paid, if in his discretion, he shall believe the happiness and prosperity of said tribe would be promoted thereby."

The court found (finding 6) the total amount ceded under this treaty to have been 96,051.48 acres, less certain reservations amounting to 1605.43 acres; that of this amount there was sold at public sale to the highest bidder between December 24 and December 31, 1832, 9841.27 acres at the rate of $2.08¾ per acre, or a total of $20,543.65.

The remainder of the land so ceded was sold at private sale at the rate of $1.25 per acre. Some of the land sold at this rate of $1.25 per acre had improvements upon it; but most of the land so sold was unimproved. The lands were

sold with reasonable expedition; the last sale being June 30, 1840.

In respect to this, the government is alleged to have violated its trust in selling the lands at private sale, the covenant of the treaty being to expose the land to public sale, to the highest bidder, in the manner of selling public lands.  In this connection the court found that, by the act of May 18, 1796, c. 29, 1 Stat. 464, entitled "An act providing for the sale of the lands of the United States, beyond the territory northwest of the River Ohio, and above the mouth of the Kentucky River," it was provided that the land should be surveyed and laid out in sections of 640 acres, and by section 4, that they "shall be offered for sale at public vendue, under the direction of the governor or secretary of the western territory and the surveyor-general, . . . provided always, that no part of the lands directed by this act to be offered for sale, shall be sold for less than two dollars per acre." So by an act of May 10, 1800, amendatory of this, 2 Stat. 73, it was further provided, sec. 5, "that no lands shall be sold by virtue of this act, at either public or private sale, for less than two dollars per acre."

Construing the treaty of 1831 in connection with these acts, the court was of opinion that "the United States failed in their duty, when they sold any of these lands otherwise than *at public sale, to the highest bidder*, in the manner of selling the public land, and as trustees of these Indians and their guardians, are liable to them for any loss which the Shawnees may have thus sustained;" and that the best evidence of the amount these lands would have produced if sold according to the treaty stipulations was contained in the statutes above cited, and was, therefore, fixed by the court at $2 per acre.

Assuming that the court was correct in its legal proposition that the government was bound to expose all these lands to public sale to the highest bidder, we think it was mistaken in its inference that the land would have brought $2 per acre if so sold.  The attention of the court does not seem to have been called to the act of April 24, 1820, c. 51, 3 Stat. 566, en-

titled " An act making further provisions for the sale of public lands," the third section of which provided " that from and after the first day of July next, the price at which the public lands shall be offered for sale, shall be one dollar and twenty-five cents an acre, . . . 'and all the public lands which shall have been offered at public sale before the first day of July next, and which shall then remain unsold, as well as the lands which shall thereafter be offered at public sale, according to law, and remain unsold at the close of said public sales, shall be subject to be sold at private sale, by entry at the land office, at one dollar and twenty-five cents an acre, to be paid at the time of making such entry as aforesaid." Now as this act was in existence at the time of the treaty of 1831, and was the latest act upon the subject, the reasoning of the court would indicate that the value of the land should have been fixed at $1.25 per acre instead of $2. By the express terms of the act of July 14, 1832, c. 240, 4 Stat. 601, the lands covered by this treaty were " attached to, and made to form a part of, the land districts in which the same are respectively situated, and liable to be sold as other public lands in the State of Ohio."

In view of the act of 1820, above cited, permitting lands which remained unsold after having been offered at public sale, to be sold at private sale at $1.25 per acre, and the act of July 14, 1832, attaching these lands to their several land districts and permitting them to be sold as other public lands in the State of Ohio, it may admit of some doubt whether the government can be held by this court to have been guilty of a violation of its trust in selling these lands at private sale. If it had appeared that the government had " exposed " these lands to public sale, to the highest bidder, and failing to find a bidder above the statutory price of $1.25 per acre, had then sold them at private sale at that price, its obligation would have been completely discharged. But as there is no evidence that they were ever exposed to public sale, we incline to the view expressed by the court below that, as between the government and the Indians, there was a failure on the part of the former to observe the stipulation of the treaty and a viola-

tion of its trust. The obligation being expressed to expose them to public sale, it was incumbent upon the government to show, either that it had done so and failed to find a bidder, or for some other reason it had been released·from the provisions of the treaty. The privilege of selling the lands " in the manner of selling the public lands " does not·nullify the obligation to expose them at public sale, which still remained; but it required them to be sold subject to the conditions and in the manner prescribed by the act of 1820.

The difficulty, however, is in estimating the damages the Shawnees suffered by its failure of duty in that particular. ·We cannot assume that, because a portion of the tract sold at auction brought $2.08$\frac{3}{4}$ per acre, the whole tract might have been sold at that price, at least in the absence of evidence that all was of equal value, since the part so sold may have been the most valuable of the entire tract. We have shown that the estimate of $2 per acre was based upon a statute fixing the price of public lands, which had been repealed. In· the absence of' any proof of the actual value of these lands at this time, there would seem to be no method of estimation except by taking the price at which public lands were subject to be sold at private sale, namely; $1.25 per acre. Not only is there some presumption that the government would not sell them for less than they were worth, but the very fact that at that time all public lands were subject to entry at $1.25 per acre, would render it impossible to sell them at a greater price, unless by reason of their peculiar location, abundant· timber, or extraordinary fertility, they were exceptionally valuable. We are not informed why the land sold at auction brought the price it did, but if the other lands were of like value, there is every reason to believe that the government, charged as it was with a trust to dispose of them at public sale for the best price that could be obtained, would have exposed them to sale in the same manner. The inference is that it was deemed for the best interests of the beneficiary to dispose of them at private sale for the statutory price, and while this may not excuse the government for a failure to comply with its obligation to sell them at auction, it tends

strongly to show that the Indians in reality suffered no damage by such action.

It results from this that from the total of $189,753.21, given as the yield of this tract, there must be deducted seventy-five cents per acre upon 84,604.78 acres, or $63,453.58, leaving $126,299.63. Subtracting from this the amount paid to the Shawnees, as found in the sixth finding, $87,257.63, leaves $39,042.00 as the balance due in 1840.

3. Are the Indians entitled to interest upon this amount? By Rev. Stat. § 1091: "No interest shall be allowed upon any claim up to the time of the rendition of judgment thereon by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest." The real question here is whether there was a contract expressly stipulating for the payment of interest, or is this a mere claim for unliquidated damages?

By the seventh article of the treaty, it was agreed that the proceeds of the lands, after making the several deductions, "should constitute a fund for the future necessities of said tribe, parties to this compact, on which the United States agree to pay to the chiefs, for the use and general benefit of their people, annually, five per centum on the amount of said balance, as an annuity. Said fund to be continued during the pleasure of Congress, unless the chiefs of the said tribes or band, by and with the consent of their people, in general council assembled, should desire that the fund thus to be created, should be dissolved and paid over to them." While this is not literally an agreement to pay interest, it has substantially that effect. It is true it is called an annuity, but the amount of the annuity is measured by the interest paid upon funds held in trust by the United States, (Rev. Stat. § 3659,) upon investments for Indians, (§ 2096,) as well as by the interest paid upon an affirmance by this court of judgments of the Court of Claims. (§ 1090.) A case somewhat analogous is that of *United States* v. *McKee*, 91 U. S. 442, which was a claim of the heirs and legal representatives of one Vigo, on account of supplies furnished in 1778 to troops acting under a commission from the State of Virginia. As

the act, under which the Court of Claims took jurisdiction of the case, directed it to be governed by the rules and regulations theretofore adopted by the United States in the settlement of like cases, and as the case was similar to those in which interest had been allowed by the act of 1790, under which act the claim would have been made but for the statutes of limitation, the interest was allowed, though it was not claimed that there was literally a contract expressly stipulating for the payment of interest.

While the treaty bound the government to pay a five per cent annuity until the dissolution of the fund, which dissolution took place September 28, 1852, when the sum of $37,180.58, the amount of the fund resulting from actual sales, was paid over to the chiefs of the tribe, this dissolution terminated the stipulation for the annuity only *pro tanto.* If the government had originally accounted for the whole amount for which the court below held it to be liable, it would have paid five per cent upon this amount until the whole fund was paid over. The fund as to this amount being not yet distributed, the obligation to pay the five per cent annuity continues until the money is paid over. Upon the whole, we think the court did not err in allowing interest.

4. An allowance of $10,506.39, based upon the eighth article of the finding, arose from a failure of certain orphan children to receive the annuity stipulated to be paid them by a treaty of May 10, 1854, 10 Stat. 1053. By this treaty the Shawnees ceded their lands to the United States, and as part consideration therefor received 200,000 acres in the State of Kansas, the government further agreeing to pay the sum of $829,000 in certain instalments. The eighth article of the treaty provided that "such of the Shawnees as are competent to manage their affairs, shall receive their portions of the aforesaid annual instalments in money. But the portions of such as shall be found incompetent to manage their affairs, whether from drunkenness, depravity, or other cause, shall be disposed of by the President, in that manner deemed by him best calculated to promote their interests, and the comfort of their families; the Shawnee Council being first consulted with

VOL. CLV—13

respect to such persons whom it is expected they will designate to their agent. The portions of orphan children shall be appropriated by the President in the manner deemed by him best for their interests." Under the discretion vested in him by the last clause of the section, the President deemed it best to pay their money over in severalty. The Shawnee Council created certain so-called guardians of the orphan children, and to them the defendants paid a portion of the orphans' money, which by laches or dishonesty never reached the orphans. Another portion of the orphans' money was committed to a United States Indian superintendent for distribution. He embezzled it, and this money was lost to the orphan children. The total amount thus lost was $10,506.39.

Conceding that the government is justly liable for such portion of this money as was committed to the Indian superintendent for distribution, and embezzled by him, it does not follow that it is liable for such portion as was paid over to guardians of the orphan children created by the Shawnee Council. The President was authorized to appropriate the portions of these children in the manner deemed best for their interests. He adjudged, probably wisely, that it should not be paid directly to the children. To whom should he pay it if not to their guardians — guardians who were created by a council of the tribe, which is now seeking to repudiate its own act and hold the government responsible for the misfeasances of its own agent? The finding does not show when the money was paid, but from the fact that the obligation to pay arose in 1854, it may safely be assumed that the payments were made before the act of July 5, 1862, the sixth section of which, embodied in Rev. Stat. § 2108, prohibited money to be paid to any person appointed by any Indian council to receive money due incompetent or orphan Indians. There can certainly be no presumption that it was paid in the face of an act expressly inhibiting such payment.

While there may be a moral obligation on the part of the government to reimburse the money embezzled by the Indian superintendent, and in fact an appropriation appears to have been made for that purpose, act of July 7, 1884, c. 334, 23

Stat. 236, 247, it is by no means clear that, under the acts of 1890 and 1892, the Shawnees were authorized to recover and collect from the government any other moneys than those which they claimed in their tribal relation or capacity. The money in question is not due the tribe as such, but to certain individual orphans, who claim to have been defrauded. But whether this be so or not, there is nothing in the record to indicate how much of this money was embezzled by the guardians created by the Indian Council, and how much by the Indian superintendent, so that there is in reality no basis for a decree in their favor. In this particular we think there was error in the decree of the court below. Whether in a suit by the individual orphans they would be held bound by the receipt of the money by the guardians appointed by the council of their tribe, may be a different question.

5. Exception is also taken to the decree of the court directing a payment of ten per cent of the amount recovered to the attorney and counsel of the Shawnees as his compensation, to be deducted from the total amount of the decree in their favor. By the third section of the act of 1890, (26 Stat. 636,) by which this suit was first authorized, it was enacted that "the said Shawnees, Delawares, and freedmen may be represented by attorneys and counsel. And the court is hereby authorized to decree the amount of compensation of such attorneys and counsel fees, not to exceed ten per centum of the amount recovered, and order the same to be paid to the attorneys and counsel of the said Shawnees, Delawares, and freedmen." It is true that this provision, literally interpreted, refers only to compensation in suits authorized in the second section of the act, to be brought against the Cherokee Nation and the United States, to recover from the Cherokee Nation moneys unlawfully diverted by it; but we think that within the true intent and spirit of the act, the fourth section, which authorizes the suit in question against the United States to recover money wrongfully diverted from their tribal fund, should be read in the same connection. This view is emphasized by the fact that by the final clause of section 4, "the right of appeal, jurisdiction of the court, process, procedure, and proceedings

in the suit here provided for, shall be as provided for in sections one, two, and three of this act." . It was evidently intended by this provision that section 3 should be read into and made a part of section 4, so far as the same could be made applicable. There was no error in authorizing a compensation to counsel of ten per centum on the amount recovered, and the action of the court in that particular was correct.

The judgment of the court below must, therefore, be

*Reversed and the case remanded with directions to recompute the amount due to the Indians and their counsel in conformity with this opinion, and enter a decree accordingly.*