Williams, Judge,
delivered the opinion of the court:
The act of Congress of May 24, 1924, 43 Stat. 139, vested jurisdiction in this court “ notwithstanding the lapse of time or statutes of limitation, to hear, examine, and adjudicate and render judgment in any and all legal and equitable claims arising under or growing out of any treaty or agreement between the United States and the Creek Indian Nation or Tribe, or arising under or growing out of any act of Congress in relation to Indian affiairs, which said Creek Nation or Tribe may have against the United States, which claims have not heretofore been determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United States: * * * ”
By joint resolution of May 19, 1926, 44 Stat. 568, it was provided that plaintiff might present its claims in separate suits on one or more causes of action. This is one of a series of suits instituted by plaintiff under the foregoing jurisdictional act as modified by the joint resolution of May 19, 1926.
Plaintiff in its amended petition and suggested findings of fact makes three claims as follows:
1. The sum of $1,123,548.48 disbursed by the Secretary of the Interior for the benefit of the Creek Nation from the Creek tribal funds, between July 1, 1898, and June 30, 1929.
2. The sum of $26,233.91 which it is alleged was lost to the plaintiff’s tribal funds because of erroneous bookkeeping entries made by the defendant.
3. The sum of $1,401,195.01 representing interest on the foregoing amounts at the rate of 5 per centum per annum from the respective dates of the alleged illegal disbursements and erroneous bookkeeping entries to date of judgment.
The three claims will be considered in the order of their statement.
ALLEGED ILLEGAL DISBURSEMENTS
The plaintiff contends that the Secretary of the Interior did not have a legal right to expend the tribal funds without the express authority of Congress. The challenged dis *485 bursements, set forth in finding II, were not specifically appropriated, and the plaintiff says they were not otherwise expressly authorized, hence it is contended the payments were illegally made by the Secretary of the Interior, and were unauthorized diversions of the tribal funds for which the United States is liable. The right to recover the amount of these expenditures is grounded solely on the contention that they were not expressly authorized by Congress.
The defendant contends that the Secretary of the Interior was authorized by law to make the payments involved.
That Congress has plenary power over the administration of Indian affairs is well settled. Cherokee Nation v. Georgia, 5 Pet. 1; Cherokee Nation v. Hitchcock, 187 U.S. 294; Lone Wolf v. Hitchcock, 187 U.S. 553. The Secretary of the Interior has only such authority over the funds of Indian tribes as is confided in him by Congress. He cannot legally disburse and pay out Indian funds for purposes other than those authorized by law. This rule is the test by which the legal right of the Secretary of the Interior to make the disbursements involved must be determined. The contention, however, that the Secretary of the Interior could legally make only such disbursements as were expressly authorized by Congress cannot be conceded. The authorities cited in plaintiff’s brief in support of this contention, when considered in the light of the precise questions presented, do not sustain it. The opinion of Attorney General Mitchell of October 5, 1929 (36 Op. Attys. Gen. 98-100), in fact, refutes the contention, and in effect lays down the rule that the authority of the Secretary of the Interior over Indian property may arise from the necessary implication as well as from the express provisions of a statute. We think this is the correct rule and will apply it in determining whether the Secretary of the Interior was authorized to make the payments in question. The authority of the Secretary of the Interior to make the payments, or his lack of authority to make them, must be found in the treaties between the United States and the Creek Nation, and the various acts of Congress dealing with Creek tribal affairs.
By article 14 of the treaty of March 24, 1832, 7 Stat. 368, the United States agreed that the “ Creek country west of *486 the Mississippi shall be solemnly guaranteed to the Creek Indians, nor shall any State or Territory ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves, so far as may be compatible with the general jurisdiction which Congress may think proper to exercise over them.” This guaranty was reiterated in article 15 of the treaty of August 7, 1856, 11 Stat. 103, and article 10 of the treaty of June 14, 1866, 14 Stat. 788. Under the provisions of these treaties the Creek Nation managed its own aifairs largely independent of the Federal Government for more than half a century. During this time it maintained a tribal government with a written constitution modeled after that of the United States, exercising legislative, executive, and judicial functions throughout the limits of the Creek country. Complete control over the disbursement of the tribal funds was entrusted to the tribal authorities by article VII of the treaty of August 7, 1856, swpra, which reads:
“ARtxcle VII. It being the desire of the Creeks to employ their own teachers, mechanics, and farmers, all of the funds secured to the nation for educational, mechanical, and agricultural purposes, shall as the same become annually due, be paid over by the United States to the treasurer of the Creek Nation. And the annuities in money due the nation under former treaties shall also be paid to the same officer, whenever the general council shall so direct.”
Following the ratification of this treaty all Creek tribal income was paid by the United States directly to the Creek treasurer, and was disbursed by the tribal authorities as directed by the legislative council of the Creek Nation. In other words, the Creek Nation was permitted, through its national legislative council, to determine the purposes for which the Creek tribal funds should be expended, and to make disbursements of the same through its own officials, free from interference on the part of the United States. Control of the Creek Nation over the distribution of its tribal funds was also provided in article II of the treaty of January 19, 1889, the act of March 1, 1889, 25 Stat. 757, 758. In this treaty the Creek Nation ceded to the United States a large portion of its domain for a consideration of *487 $2,280,857.10, of which sum $280,857.10 was to be paid into the Creek National Treasury in such sums and at such time as shall be directed by the national council of the said nation, and the balance, $2,000,000, to be set apart and remain in the Treasury of the United States to the credit of the Creek Nation, bearing interest at the rate of 5 per centum per annum, to be paid to the treasurer of said nation and “to be judiciously applied under the direction of the legislative council thereof, to the support of their government, the maintenance of schools and educational establishments, and such other objects as may be designed to promote the welfare and happiness of the people of the said Muscogee (or Creek) Nation, subject to the discretionary direction of the Congress of the United States * * Under these treaty stipulations and with the consent of Congress the Creek Nation continued to control the disbursement of its tribal funds until the passage of the act of June 28,1898, 30 Stat. 495, commonly known and hereinafter referred to as the Curtis Act.
The Curtis Act, the act of March 1, 1901, 31 Stat. 861,. known as “ the Original Creek Agreement ”, and the act of April 26, 1906, 34 Stat. 137, had for their purpose the creation of correct final membership rolls of the Five Civilized Tribes of Indians, the allotment of their tribal lands in severalty among the members, the sale of the surplus remaining lands after the allotments had been made, the equalization of allotments, the per capita distribution of the remaining tribal funds, and the final winding up of the tribal affairs, together with the dissolution of the tribal governments. These acts each dealt in a comprehensive way with the closing up of the affairs of the Creek Nation. The provisions of the respective acts, insofar as they conflicted with the provisions of the preceding act, repealed and superseded the provisions of such act. Aside from the preparation of the membership rolls of the tribe, which were made up by the Commission to the Five Civilized Tribes (Dawes Commission) the administration of these acts was committed largely to the Secretary of the Interior and to subordinate bureaus and agents of the Department of the Interior. The authority to disburse the tribal funds and all moneys coming *488 to the tribe under the provisions of the three acts was lodged solely in the Secretary of the Interior.
The provisions of the Curtis Act pertaining to the disbursements of the Creek tribal funds are found in section 19 of the act and read:
“ Sec. 19. That no payment of any moneys on any account whatever shall hereinafter be made by the United States to any of the tribal governments or to any officer thereof for disbursement, but payments of all sums to members of said tribes shall be made under direction of the Secretary of the Interior by an officer appointed bjr him; and per capita payments shall be made direct to each individual in lawful money of the United States, and the same shall not be liable to the payment of any previously contracted obligation.”
The relevant provisions of the act of March 1,1901, or the Original Creek Agreement, are in sections 32 and 33, and read as follows:
“ Sec. 32. All funds of the tribe, and all moneys accruing under the provisions of this agreement, when needed for the purposes of equalizing allotments or for other purposes herein prescribed, shall be paid out under the direction of the Secretary of the Interior; and when required for per capita payments, if any, shall be paid out directly to each individual by a bonded officer of the United States, under direction of the Secretary of the Interior, without unnecessary delay.
“ Sec. 33. No funds belonging to said tribe shall hereafter be used or paid out for any purposes by any officer of the United States without consent of the tribe, expressly given through its national council, except as herein provided.”
The provisions of the act of April 26, 1906, authorizing disbursement of the tribal funds by the Secretary of the Interior appear in sections 11 and 17 of the act, and read as follows:
“ Sec. 11. That all revenues of whatever character accruing to the * * * Creek * * * tribes, whether before or after dissolution of the tribal governments, shall, after the approval hereof, be collected by an officer appointed by the Secretary of the Interior under rules and regulations to be prescribed by him; and he shall cause to be paid all lawful claims against said tribes which may have been contracted after July first, nineteen hundred and two, or for which warrants have been regularly issued, such payments *489 to be made from any funds in the United States Treasury belonging to said tribes. All such claims arising before dissolution of the tribal governments shall be presented to. the Secretary of the Interior within six months after such dissolution, and he shall make all rules and regulations necessary to carry this provision into effect and shall pay all expenses incident to the investigation of the validity of such claims or indebtedness out of the tribal funds: * * * ”
“ Sec. 17. That when the unallotted lands and other property belonging to the * * * Creek * * * tribes of' Indians have been sold and the moneys arising from such-sales or from any other source whatever have been paid into, the United States Treasury to the credit of said tribes, respectively, and when all the just charges against the funds of the respective tribes have been deducted therefrom, any remaining funds shall be distributed per capita to the members then living and the heirs of deceased members whose-names appear upon the finally approved rolls of the respective tribes, such distribution to be made under rules and regulations to be prescribed by the Secretary of the Interior.”'
Section 19 of the Curtis Act changed only the manner in which the Creek tribal funds were to be disbursed. Neither-that section nor any other provision of the act defines or limits in any way the purposes for which the tribal funds might be expended. These funds were no longer paid into, the Creek National Treasury by the United States for the purpose of disbursement .by the tribal authorities, but were retained in the Treasury of the United States to the credit of the tribe, and were disbursed by the Secretary of the-Interior. The disbursements complained of were largely for purposes identical with those for which the funds had been expended during the preceding years by the tribal authorities. Congress undoubtedly contemplated and intended that the tribal funds would continue to be expended in the future, as they had been in the past, for the benefit of the Creek Nation and its people. Consequently, we think that when Congress, by the provisions of section 19 of the Curtis Act, took away from the Creek tribal authorities the-control which they had formerly exercised over the disbursement of their tribal funds and charged the Secretary of the Interior with the duty of disbursing the funds, without defining or limiting the purposes for which they might be expended, it by clear and necessary implication invested *490 him with authority to disburse and expend the funds in such manner and for such purposes as would, in his judgment, satisfy the needs of the Creek Nation and promote the welfare and happiness of its citizens, subject to such limitations as Congress might subsequently impose.
The authority of the Secretary of the Interior to disburse the tribal funds was continued in the act of March 1, 1901, and the act of April 26, 1906, in provisions hereinbefore set nut. In each of these acts certain restrictions and limitations on the expenditure of the tribal funds were imposed, which will be considered in the discussion of the particular expenditures to which they apply. An important limitation on the expenditure of the tribal funds generally was carried in section 18 of the Indian Appropriation Act for the fiscal year beginning July 1, 1912 (87 Stat. 518), which reads:
“ Sec. 18. Provided, That during the fiscal year ending June thirtieth, nineteen hundred and thirteen, no moneys shall be expended from the tribal funds belonging to the Five Civilized Tribes without specific appropriation by Congress, except as follows: Equalization of allotments, per capita and other payments authorized by law to individual members of the respective tribes, tribal and other Indian schools for the current fiscal year under existing law, salaries, and contingent expenses of governors, chiefs, assistant chiefs, secretaries, interpreters, and mining trustees of the tribes for the current fiscal year, and attorneys for said tribes employed under contract approved by the President, under existing law, for the current fiscal year: * * * ”
This provision was continued in each annual Indian appropriation act thereafter until the act of May 24, 1922 (42 Stat. 575), when the provision “That hereafter no money shall be expended from tribal funds belonging to the Five Civilized Tribes without specific appropriation by Congress ” was made a permanent provision of law.
While contending in the brief that all the expenditures involved were made by the Secretary of the Interior either under the express or implied authority of Congress, counsel for the Government have not discussed the effect of the foregoing limitation on the expenditure of the funds. It would have been helpful to the court if they had expressed their views on the purpose and effect of the words “ no moneys *491 ¿hall be expended from the tribal funds belonging to the 'Five Civilized Tribes without specific appropriation by Con.gress, except * * However, in view of the plain and unmistakable meaning of the language used by Congress, we see no room for discussion of the effect of the proviso on -the authority of the Secretary of the Interior to expend the tribal funds. Congress, in the exercise of its plenary power •over the funds, declared in the act of August 24, 1912 (37 Stat. 518), that with certain exceptions therein stated no jpart of the funds should be expended without specific appropriation. This limitation was continued by repeated enactments during the entire remaining period of the claim. During and for the fiscal years 1912 to 1927, inclusive, the ¡Secretary of the Interior made payments from the tribal funds which were not specifically appropriated by Congress. 'To hold that the Secretary of the Interior had the legal right 'to expend such funds, in the face of positive prohibition .•against their expenditure without specific appropriation would be equivalent to holding that the Secretary of the Interior, not Congress, had full administrative control and ¡power over the property of the plaintiff tribe. The court cannot say that, and consequently it must be held that all the • disbursements from plaintiff’s tribal funds set out in finding II that do not fall within the exceptions contained in the •proviso of section 18 of the act of August 24, 1912, and succeeding acts, were made by the Secretary of the Interior without authority of law. Such payments were not only 'made without authority of law but were made in contravention of positive provisions of law. These unauthorized -expenditures will be summarized after the disbursements prior to July 1,1912, have been considered.
SPECIAL ATTORNEYS PEES AND EXPENSES, TOWN LOT STJIT EXPENSES, $100,995.95
The disbursements under this allocation, amounting to ¡$100,995.95, were made in payment of special attorneys’ fees and expenses growing out of suits instituted in the name of the United States for the use of the plaintiff tribe for the ¡recovery of certain town lots in the Creek Nation that had *492 been conveyed to purchasers through fraudulent sales. The plaintiff contends that the United States was chargeable* with these expenditures under section 34 of the act of March-. 1, 1901, which reads:
“ The United States shall pay all expenses incident to the-survey, platting, and disposition of town lots, and of allotment of lands made under the provisions of this agreement,, except where the town authorities have been or may be. duly authorized to survey and plat their respective towns at. the expense of such town.”
The defendant contends that the Secretary of the Interior-had the authority to make the payments out of the tribal' funds under section 18 of the act of April 26, 1906, which; reads:
“ Sec. 18. That the Secretary of the Interior is hereby-authorized to bring suit in the name of the United States,, for the use of the * * * Creek * * * tribes, respectively, either before or after the dissolution of the tribal governments, for the collection of any moneys or recovery-of any land claimed by any of said tribes, whether such claim-shall arise prior to or after the dissolution of the tribal governments, and the United States courts in Indian Terri-torjr are hereby given jurisdiction to try and determine all' such suits, and the Secretary of the Interior is authorized' to pay from the funds of the tribe interested any costs and’ necessary expenses incurred in maintaining and prosecuting-such suits: * * * ”
The act of April 26, 1906, was the final act of Congress dealing comprehensively with the affairs of the Five Civilized" Tribes, including plaintiff. It was entitled “An act providing for the final disposition of the affairs of the Five Civilized Tribes in Indian Territory, and for other purposes.” Section 29 provided “ That all acts and parts of' acts inconsistent with the provisions of this act be, and the same are hereby repealed.” Section 34 of the act of March 1, 1901, therefore, insofar as it is in conflict with section 18" of the act of April 26, 1906, was repealed by that act.
The Secretary of the Interior had the authority under section 18 of the act of April 26, 1906, to contract with the-attorneys to whom the disbursements involved were made to-institute and prosecute suits for the recovery of town lots-that had been fraudulently sold, and to pay the fees of' *493 such attorneys, together with the necessary costs and expenses incurred in the prosecution of the suits, out of the tribal funds. Eslick v. United, States, 51 C.Cls. 266.
ADMINISTRATIVE EXPENSES CREEK NATIONAL GOVERNMENT, $556,590.18
The expenditures under this allocation were for the maintenance and support of the Creek tribal government, and include salaries and expenses of the ^principal tribal chiefs,, second chiefs, secretaries, council members, and miscellaneous employees whose services were engaged by the tribal, government, together with minor incidental expenses of the-. Creek executive officers.
The Creek tribal government was not abolished by the Curtis Act, and its existence was expressly extended by section 46 of the act of March 1, 1901, and by Senate Joint. Resolution No. 7, of March 2, 1906, 34 Stat. 822, and by section 28 of the act of April 26, 1906, which reads:
“ Sec. 28. That the tribal existence and present tribal governments of the Choctaw, Chickasaw, Cherokee, Creek,, and Seminole Tribes or Nations are hereby continued in full, force a,nd effect for all purposes authorized by law, until, otherwise provided by law, but the tribal council or legislature in any of said tribes or nations shall not be in session for a longer period than thirty days in any one year Provided, That no act, ordinance, or resolution (except resolutions of adjournment) of the tribal council or legislature-of any of said tribes or nations shall be of any validity until approved by the President of the United States: Provided further, That no contract involving the payment or expenditure of any money or affecting any property belonging to any of said tribes or nations made by them or any of them or bjr any officer thereof, shall be of any validity until, approved by the President of the United States.”
While the ultimate dissolution of the tribal government was contemplated in the Curtis Act, the act of March 1,. 1901, and the act of April 26,1906, Congress deemed its continuance expedient and necessary to the dual winding up of the affairs of the plaintiff tribe, and in each of these acts-its existence was continued, and thus the tribal government continued to exist and to function within the limits of its. restricted jurisdiction and power during the period in which the disbursements involved were made. Manifestly, the- *494 continued maintenance ment required funds for its support. Where were these funds to come from, if not from the tribal funds? The United States was under no treaty or other legal obligation defray the necessary running expenses of the Creek national government. Prior to the passage of the Curtis Act these expenses were paid from the tribal funds, and the intent of Congress that such expenses would continue to be paid from the tribal funds is clearly shown by the provisions of section 33 of that act, wherein it is provided that No act, ordinance, or resolution of the council of the Mus-cogee or Creek Nation * * * (except appropriations for the regular and necessary expenses of the government of the said nation) * * * shall be of any validity until approved by the President of the United States * * Congress having thus continued the existence of the tribal government and clearly indicated the intent that its “ regular and necessary expenses ” be paid from the tribal funds, the Secretary of the Interior was fully authorized, under section 19 of the Curtis Act and the relevant provisions of succeeding acts of Congress, to make the disbursements under this allocation. The disbursements made subsequent to July 1912, fall within the exception to the provisions of section ■ 18 of the act of August 24, 1912, and similar provisions of succeeding acts.
MEDICAL ATTENTION, $22,492.19
These expenditures were made chiefly for the suppression of smallpox among members of the Creek Tribe, and were made as follows: $5,022.30 during the year 1899, $6,318.27 in 1900, and $11,151.62 for 1901. The plaintiff contends that because Congress subsequently, in the act of February 14, 1902, 32 Stat. 5-22; the act of June 21, 1906, 34 Stat. 325; and the act of March 1, 1907, 34 Stat. 1015, made appropriation of public funds for the suppression of smallpox generally among the Indian tribes, that Congress intended that public funds should have been used for this purpose, and that consequently the payment of such expenses out of the Creek tribal funds was unauthorized.
*495 This contention, we think, is without merit. The Secretary of the Interior, was by the terms of the Curtis Act, vested with authority to disburse the tribal funds. There was, as we have seen, no provision in the act as to the purposes for which the funds might be expended, neither was there any provision in existing law as to the purposes for which they might be expended. We are holding, as before stated, that in these circumstances the Secretary of the Interior was by the act impliedly vested with authority to expend the tribal funds for the benefit of the people of the Creek Nation in such manner and for such purposes as would, in his judgment, promote their welfare, subject to subsequent limitations by Congress on the expenditure of the funds. No greater benefit to the Creek Nation can be conceived than the suppression of an epidemic of smallpox among its people. The Secretary of the Interior was not only authorized to expend the tribal funds for that purpose but he would have been derelict in his duty to the tribe had he not done so. The fact that Congress, after the smallpox had become prevalent in various Indian tribes, appropriated public funds to be expended in suppressing the spread of the epidemic, did not evince an intention on the part of Congress that public funds alone should be used for that purpose.
EXPENSES OE DELEGATES, $28,960
These disbursements were made prior to July 1, 1912, and were made in payment of the expenses of delegates from the Creek Nation before the Dawes Commission and various departments of the Government in Washington. With but few exceptions, the expenditures were authorized by acts of the Creek National Council which were approved by the President. The services performed by these delegates were for the benefit of the Creek Nation and the expenses incident to such services were properly paid out of the tribal funds by the Secretary of the Interior under the implied authority over the funds vested in him by the Curtis Act, and the act of April 26, 1906.
The decision of the Comptroller of the Treasury of December 7, 1891 (4 Comp. Dec. 287), is not in point. The *496 ■Comptroller in that case held that the expenses of an Indian •delegate representing his tribe before the departments in Washington could not be paid by the Secretary of the Interior out of contingency appropriations for the Indian •'Service. It was held that the services this Indian delegate was to perform were solely for the benefit of his tribe, -and not for the Interior Department, hence the Secretary of the Interior was not authorized to pay his expenses while ■engaged in such services, out of contingent appropriations for the expenses of agents and employees of the Interior Department. The decision merely followed the well-established rule that the head of an executive department cannot divert funds appropriated for a particular purpose to use .for other purposes.
education, $255,211.88
Claim for recovery as to these expenditures rests on the contention that Congress limited the yearly payments from the tribal funds for school purposes to a total of $16,468.4-0. The amount claimed under the allocation is $255,211.88, the aggregate of the yearly disbursements made by the Secretary of the Interior for school purposes over and above $76,468.40.
Section 40 of the act of March 1,1901, provides:
“ Sec. 40. The Creek school fund shall be used, under direction of the Secretary of the Interior, for the education of Creek citizens,
‡ v •i’ ^ •i’
“All moneys for running the schools shall be appropriated by the Creek National Council, not exceeding the amount of the Creek school fund, seventy-six thousand four hundred and sixty-eight dollars and forty cents; but if it fail or refuse to make the necessary appropriations the Secretary of the Interior may direct the use of a sufficient amount of the school funds to pay all expenses necessary to the efficient conduct of the schools, strict account thereof to be rendered to him and to the principal chief.”
The foregoing provision was a clear limitation on the authority of the Secretary to expend the tribal funds for edu-oational purposes. He was limited to a yearly expenditure of $76,468.40 for the purposes of education, and all amounts disbursed by him in excess of that amount were unauthor *497 ized. This limitation, however, was not retroactive and had no application to the authority of the Secretary to disburse tribal funds for educational purposes for the preceding years ■of 1900 and 1901, in which years he had expended the sums •of $78,750.51 and $25,740.55, respectively, in excess of $76,-468.40. These expenditures were practically all authorized by the Creek legislative council under appropriation acts duly passed by that body and certified to and approved by the President in accordance with the provisions of section •33 of the Curtis Act. The Secretary of the Interior clearly had the implied authority to make the disbursements for the .years 1900 and 1901. The Secretary disbursed for education in excess of the amount authorized by section 40 of the act of March 1, 1901, the following sums: For the year 1902, $20,021.85; for 1904, $10,800.87; and for 1905, $29,024.66.
The next legislation with reference to disbursements from the tribal funds for school purposes is found in section 10 of the act of April 26, 1906:
“ Sec. 10. That the. Secretary of the Interior is hereby authorized and directed to assume control and direction of the schools in the Choctaw, Chickasaw, Cherokee, Creek, and Seminole Tribes, * * * to defray all the necessary expenses of said schools, using, however, only such portion of ■said funds of each tribe as may be requisite for the schools of that tribe, not exceeding in any one year for the respective tribes the amount expended for the scholastic year ending June thirtieth, nineteen hundred and five; * *
The report of the Comptroller General shows that the amount expended for educational purposes for the Creek Tribe for the scholastic year ending June 30, 1905, was $105,493.06. This amount therefore was the lawfully authorized sum that could thereafter be expended from the tribal funds for the purpose of education. The Secretary of the Interior made disbursements in excess of this amount during but one of the remaining years of the claim, the year 1907, in which year he disbursed $110,669.03, or $5,175.97, in excess of the amount he was authorized to expend. The disbursements for education made subsequent to July 1, 1912, come within the exceptions to the proviso contained in the act of August 24, 1912, and similar provisions of succeeding acts.
*498 OTHER DISBURSEMENTS PRIOR TO JULT 1, 1912
We do not deem it necessary to discuss in detail tbe remaining disbursements made before July 1,1912. The plaintiff received the sole benefit of these expenditures, many of which were made to meet its urgent needs. A portion of the payments was made on Creek tribal warrants for expenditures which had been authorized by the legislative council of the Creek Nation and approved by the President. Payments made under these circumstances were impliedly authorized under section 83 of the Curtis Act, section 42 of the-act of March 1, 1901, and section 28 of the act of April 26, 1906, as well as under other provisions of those acts here-inbefore referred to. We hold, therefore, that the disbursements from the tribal funds made by the Secretary of the Interior prior to July 1, 1912, were authorized by Congress, either expressly or by necessary implication, except the portion of the expenditures for school purposes before stated.
Our conclusion on this branch of the case is that the amounts disbursed by the Secretary of the Interior for education in excess of the amounts fixed for that purpose in section 40 of the act of March 1, 1901, and section 10 of the act of April 26, 1906, were made without the authority of Congress, and that all expenditures made from the funds subsequent to July 1, 1912, without specific appropriation by Congress, that do not fall within the exceptions to the proviso contained in section 18 of the act of August 24, 1912, and similar provisions of succeeding acts, were likewise made without authority from Congress. These disbursements were not only made without the authority of Congress, but were in each case made in violation of limitations imposed by Congress on the expenditure of the funds.
The unauthorized payments made from the funds prior to July 1, 1912, are as follows:
1902_ $20, 021. 85
1904_ 10, 800. 87
1905______ 29,024.66
1907_______ 5, 175. 97
Total. 65, 023. 35
*499 The -unauthorized payments from the funds subsequent to •July 1, 1912, follow:

For fiscal year 1913

'Pay of Indian police_ $3. 00
Expenses, miscellaneous litigation- 4, 396. 94
Pay, miscellaneous employees- 270. 00
Expenses of appraisal and sale of unallotted lands- 1. 00
■Insurance on school buildings- 143. 01
Total_ 4, 813. 95

For fiscal year 1914

•Expenses of miscellaneous litigation-$3, 401. 49
Expenses of appraisal and sale of tribal property- 17. 68
Insurance on school buildings_ li 090. 30
Total_ 4, 509. 47

For fiscal year 1915

'Expenses of miscellaneous litigation- $401. 85
Pay of miscellaneous employees_ 2, 905. 01
■Insurance on school buildings_ 76. 25
Total_ 3, 383. 11

For fiscal year 1916

'Expenses, miscellaneous litigation_ $509. 88
■Pay of miscellaneous employees_ 3, 113. 33
Total.-____ 3,623.21

For fiscal year 1917

Expenses, equalization of allotments_$3, 276. 67
•Insurance on school buildings_ 615. 95
Total_ 3, 892. 62

For fiscal year 1918

Expenses, equalization of allotments_$3, 329. 73
Expenses, miscellaneous litigation_ 1, 089. 92
Pay miscellaneous employees_ 10. 00
Miscellaneous agency expenses_ 242. 61
Expenses of appraisal and sale of unallotted lands_ 16. 75
•Advertising sale of unallotted lands_ 1, 258. 10
Total 5, 947-, 11

*500
For fiscal year 1819

Expenses, miscellaneous litigation_$1, 787. 64
Advertising sale of unallotted lands_ 23. 85-
Insurance on school buildings_ 10. 26
Total___ 1, 821. 75-

For fiscal year 19SO

Expenses, equalization of allotments_$6, 992. 31
Expenses of miscellaneous litigation_ 2, 034. 11
Total_ 9, 026. 42

For fiscal year 1921

Expenses of equalization of allotments_$2, 392. 19
Expenses, miscellaneous litigation_ 422. 74
Total_ 2, 814. 93

For fiscal year 1928

Expenses, miscellaneous litigation_ $16. 81:

For fiscal year 1923

Expenses, miscellaneous litigation_ $314. 81
Advertising, sale of unallotted lands_ 25. 13
Insurance on school buildings_ 2, 735. 52
Total_ 3, 075. 46»

For fir, cal year 1924

Advertising, sale of unallotted lands_ $33. 12.

For fiscal year 1925

Insurance on school buildings_$1, 311. 38-

For fiscal year 1986

Payment to Susie Rogers etal_$1, 303. 00-

For fiscal year 1927

Advertising, sale of unallotted lands_ $49. 23:
Total. 45, 62l. 57/
*501 The unauthorized expenditures, as shown above, amount to $110,644.92. The defendant suggests that since all the disbursements involved in suit were made in good faith by the Secretary of the Interior for the promotion of the welfare and happiness of the Creek Nation and its people, and since the plaintiff tribe in fact received the benefit of the expenditures, the court would be justified under the general rules of equity in making an award in favor of the Government for whatever amount may be found by the court to be technically due the plaintiff by reason of the illegal disbursements or expenditures. It may be said in answer to this suggestion that the Government has not asserted or plead a counterclaim, equitable or otherwise, against the plaintiff, growing out of the disbursement of the tribal funds. The court, under the jurisdictional act, is authorized to “ hear, examine, adjudicate, and render judgment in any and all legal or equitable claims * * * which said Creek Nation or Tribe may have against the United States ”, and to also “ hear, examine, consider, and adjudicate any claims which the United States may have against said Indian Nation.” The United States has presented no counterclaim against the Creek Nation other than the claim which has heretofore been considered and adjudicated by the court in Creek Nation v. United States, No. F-205, 77 C.Cls. 159. The court is without jurisdiction to make the award suggested, and is not concerned with the question whether as a matter of equity and good conscience the plaintiff, having once received the benefit of the payments, ought now be permitted to have the benefit of them again. Congress disposed of that question when it waived the statute of limitations and permitted the plaintiff to assert in this court whatever legal claims it might have against the United States. The sole question before the court on this phase of the case is: Does the plaintiff have a legal claim against the United States for the amount of the expenditures from its tribal funds made by the Secretary of the Interior without authority of Congress ? That question, we think, must be answered in the affirmative.
*502 ERRONEOUS BOOKKEEPING ENTRIES, $26,283.97
The items comprising this claim fall within two classes: First, erroneous debits and credits in respect to the funds generally, and second, the return to surplus account of un-expended balances from certain appropriations.
As to the items falling within the first class, the report of the Comptroller General shows that certain errors in bookkeeping were made by the United States in handling the plaintiffs funds. Some of these mistakes were made in favor of the Creek Nation, and some were made in favor of the United States. These errors are set forth in finding III, and show a balance due the Creek Nation amounting to $16,455.62.
By the act of March 3, 1891, 26 Stat. 1010, $7,095 was appropriated for the per capita payment to 129 citizens of the Creek Nation who, under the direction of the Secretary of the Interior, had removed themselves from the State of Alabama to the Creek Nation in the Indian Territory, and subsisted themselves for one year in accordance with article XII of the treaty of March 24, 1832, supra. During the years 1891 and 1893 there was disbursed from the said appropriation to self-emigrating «.Creeks who were entitled to receive the same, the sum of $4,620. The balance of the appropriation, $2,475, was carried on the books of the Indian Office until June 30,1900, when the unexpended portion was returned to the surplus fund by surplus warrant no. 43. The Creek Nation as a tribe had no title to any part of the funds carried in this appropriation and the unex-pended portion of the fund was properly returned to the surplus account.
Section 26 of the act of March 1, 1901, provided for the submission of the “ Loyal Creek claim ” to the Senate of the United States for determination. Pursuant to said pro-lusion, the sum of $600,000 was awarded as a final settlement of the Loyal Creek claim, which amount was appropriated by the act of March 3, 1903, 32 Stat. 994, and was set up and carried on the books of the United States Treasury under the heading “ Payment to Loyal Creeks and Freed *503 men.” By the terms of the act the Secretary of the Treasury was authorized, to pay, under the direction of the Secretary of the Interior, to such loyal Creek Indians and Freedmen named in articles III and IV of the treaty of the Creek Nation of Indians of June 14, 1866, supra, the said sum, to be paid to such Indians and Freedmen only whose names appeared on the list of awards made in their behalf by W. B. Hazen and F. A. Field as Commissioners on behalf of the United States to ascertain the losses of the said Indians and Freedmen. There was disbursed and paid out of the said appropriations to Indians and Freedmen entitled to receive the same, the sum of $592,696.65. The unexpended balance of the appropriation, $1,303.35, was returned to the surplus fund by surplus warrant no. 62, dated March 19, 1929. This appropriation was not made for the benefit of the people of the Creek Nation generally. Its benefits were limited to those Indians and Freedmen who had suffered losses because of their loyalty to the United States during the Civil War and whose names appeared on a designated list, and to the legal heirs and representatives of those who had died. The unexpended balance of the appropriation was properly- returned to the surplus fund.
INTEREST
The third item of the claim is for interest at the rate of 5 percent per annum on the unauthorized expenditures and the erroneous bookkeeping entries, from the date of such expenditures and entries to the date of judgment.
During the period involved, the tribal funds belonging to-the Creek Nation, with perhaps slight exceptions, immaterial here, were carried on the books of the Treasury of the United States under four separate and distinct headings, as follows: (1) “General Creek fund”, (2) “Interest on general Creek fund ”, (3) “Indian moneys, proceeds of labor ”, and, (4) “ Interest on Creek moneys on deposit in banks.” All the payments which we have held to have been unauthorized were made from one or another of these funds, principally, however, from the three last named.
Article II of the treaty of January 19, 1889, supra (the act of March 1, 1889), under the provisions of which the *504 “ Creek general fund ” was originally set up, specifically stipulated for the payment of interest on the fund at the rate of 5 per centum per annum. The act of May 27, 1902 (32 Stat. 245), under the provisions of which the permanent annuities guaranteed the Creek Nation in former treaties were commutated at the sum of $999,368.00, and added to the “ Creek general fund ”, provided that the fund thus adde'd should also draw interest at the rate of 5 per centum per annum. The funds properly belonging to the “ Creek .general fund ” were therefore interest-bearing funds. The United States contracted with the plaintiff, both by treaty and by statute, that it would pay interest on the “ Creek general fund ” until the same was paid over for the purposes for which it was created. To the amount of the unauthorized payments made from the fund the “ Creek general fund ” has not yet been disbursed, and the obligation of the Government to pay 5 percent interest continues until the money is paid over. United States v. Blackfeather, 155 U.S. 180.
The plaintiff contends that section 27 of the act of March 1, 1901, providing that “All treaty funds of the tribe shall hereafter be capitalized for the purpose of equalizing allotments and for other purposes provided in this agreement ”, and the act of May 27, 1902, by which $999,638.00 was added to the “ Creek general fund ” to bear interest at 5 per centum per annum, evinced an intention on the part of Congress to make one “ General Creek fund ” for all Creek moneys arising from all sources, which fund should draw interest at 5 per centum per annum until drawn out of the Treasury for purposes authorized by law. This contention cannot be sustained. Certainly the interest on the “ Creek general fund ”, as it accrued annually, could not be properly credited to the corpus of that fund. This would amount to the payment of compound interest on the “ Creek general fund.” The funds set up and carried under the heading “ Indian moneys, proceeds of labor ”, in the main arose from revenues received from the sale and lease of property belonging to the Creek Nation, which were collected by officers of the United States under the provisions of the Curtis Act, the act of March 1,1901, the act of June 30, 1902 (32 Stat. *505 500), and the act of April 26, 1906. It may be, as the plaintiff contends, that the crediting of these funds under the heading “ Indian moneys, proceeds of labor ”, was not authorized by section 2 of the act of March 3, 1883 (22 Stat. 582). This fact, however, is material only to the extent that the Secretary of the Interior would not have discretionary powers over the disbursement of the fund under the act of March 2, 1887 (24 Stat. 449). Moneys arising from the sources stated clearly could not be credited to the interest-bearing “ Creek general fund.” The same is true as to the funds credited under the heading of “ Interest on Creek moneys on deposit in banks ”, which were collected under the provisions of the act of March 3,1911 (36 Stat. 1070). There being no treaty or statutory obligation on the part of the United States to pay interest on Creek tribal funds, other than those belonging to the “ Creek general fund ”, interest can be allowed only on such of the unauthorized disbursements as were made from that fund.
Disbursements from the “ Creek general fund ” are shown in disbursement schedule no. 96 in the Report of the Comptroller General at pages 518 to 521, inclusive. Unauthorized payments made from the fund amount to $22,710.25. Interest on the respective items of these unauthorized disbursements computed at the rate of 5 per centum per annum, from the close of the fiscal year in which they were made, to date of judgment, amounts to $17,005.47.
The erroneous bookkeeping entries set forth in finding III were all made in the handling of funds other than the •“ Creek general fund.” Consequently the claim for interest in respect to them cannot be allowed.
Upon the whole case the plaintiff is entitled to recover the sum of $144,106.01, as follows:
1. Unauthorized disbursements from the tribal funds— $110, 644.92
2. Erroneous bookkeeping entries- 16, 455. 62
3. Interest_ 17, 005.47
It is ordered that judgment be entered against the United States in favor of the plaintiff for the sum of $144,106.01.
Whaley, Judge; LittletoN, Judge; GreeN, Judge; and Booth, Chief Justice, concur.