Williams, Judge,
delivered the opinion of the court:
The jurisdictional act under which suit is brought is set out in finding 1.
The jurisdiction of the court to hear and determine the issues presented in the amended petition, filed on September 19, 1934, is not questioned by the defendant. The claim is one of accounting, except as to one item, and in the main is similar to the claim presented in The Creek Nation v. United States, 78 C. Cls. 474.
The claim grows out of the provisions of treaties between the United States and the Seminole Nation of Indians of the dates of August 7, 1856 (11 Stat. 699), and March- 21, 1866 (14 Stat. 755), and numerous acts of Congress which will be referred to in connection with the particular items of the claim to which they apply.
The report of the General Accounting Office contains a complete and admirably arranged statement of the relevant treaties and statutes, also a detailed recital of all appropriations made by Congress in fulfillment of the various treaty obligations, and an itemized account of disbursements made of such appropriations by the Secretary of the Interior. The special findings of fact are based on the figures shown in the report and, while not arranged in the exact order in which the various items of the claim are presented in the petition and the plaintiff’s suggested findings of fact, present a concise and easily comprehended statement of the material facts upon which the claim is based.
The plaintiff’s claim in the aggregate amounts to $1,746,013.23, and consists of items falling generally within two classes:
1. Items as to which it is alleged that the United States failed to make payments in the amounts and in the manner *145 provided by its treaties and agreements with, tbe Seminole Nation.
2. Items as to which it is alleged payments were made by the Secretary of the Interior out of Seminole trust funds without authority of law.
These items will be considered in the order in which the facts upon which they are based are set forth in the special findings of fact.
Item 1 {finding fi), amownt claimed $61fi63.fiB. In the treaty of August 7, 1856, between the United States and the Creek and Seminole Tribes of Indians, the United States in respect to the Seminóles agreed to provide annually for a period of ten years: $3,000 for the support of schools, $2,000 for agricultural assistance, and $2,200 for the support of smiths and smith shops. This obligation entailed a total expenditure for the purposes named of $72,000 for the ten-year period. Congress annually appropriated the moneys due the Seminóles under this provision but only $10,436.58 of the amount appropriated was disbursed for the purposes named in the treaty. This the defendant concedes.
The defendant says that, notwithstanding the fact that the full amount due was not provided for the purposes named in the treaty, there is no balance due the plaintiff on that account for the reason that the defendant wa,s authorized by the act of July 5, 1862 (12 Stat. 512, 528) ,[1] and the appropriation acts of March 3, 1863 (12 Stat. 793), June 25, 1864 (18 Stat. 180), and March 3, 1865 (13 Stat. 562), to *146 divert these funds from the purposes for which they were appropriated and to disburse the same for the relief of loyal refugee Indians of the Seminole and other Indian tribes, and that this was done. It is also contended that this action was later ratified by article VIII of the treaty of 1866, which provided:
The stipulations of this treaty are to be a full settlement of all claims of said Seminole nation for damages and losses of every kind growing out of the late rebellion, and all expenditures by the United States of annuities in clothing and feeding refugee and destitute Indians since the diversion of' annuities for that purpose, consequent upon the late war with the so-called confederate states. And the Seminóles hereby ratify and confirm all such diversions of annuities heretofore made from the funds of the Seminole nation by the United States. * * *
The act of July 5, 1862, supra, was operative only “during the discretion and pleasure of the President.” It is not shown that the President ever took any action under this statute either by declaring by proclamation the abrogation of “all treaties” with the Seminóles, or by directing that “appropriations heretofore or hereafter made” to carry into effect treaty stipulations with them “be suspended and postponed wholly or in part.” Without action on the part of the President the act by its own terms was ineffective.
The release stipulated in article VIII of the treaty of 1866, insofar as it relates to the diversion of Seminole funds by the Secretary of the Interior during the War of the Kebellion, covers only the diversion of annuity payments. As to tírese funds the Seminole Nation ratified and confirmed “all such diversions of annuities heretofore made from the funds of the Seminole Nation by the United States.” The United States had diverted the sum of $249,-131.88 of Seminole moneys during the period of the Civil War — from the fiscal years 1862 to 1866 — an amount largely in excess of the amount of annuity funds diverted. Had the release been intended to ratify and confirm the diversion of other than the annuity payments, we think such intention would have been expressly stated. The general language, “The stipulations of this treaty are to be a full *147 settlement of all claims of said Seminole Nation for damages and losses of every kind growing out of the late Rebellion”, has no application and cannot be held to include this item of the Seminole claim for the reason that substantially the whole amount claimed was due and unpaid before the outbreak of the war and consequently is not one for “damages and losses growing out of the War of the Rebellion.” The simple facts are that the United States covenanted with the Seminole Tribe in article VIII of the treaty of 1856, as a part of the consideration for the treaty, to provide annually for them for a period of ten years fixed sums for the support of schools, for agricultural assistance, and for the support of smiths and smith shops among them. In the absence of subsequent specific enactment by Congress to the contrary, the United States was obligated to disburse the funds stipulated in the manner and for the purposes designated in the treaty. The United States failed to discharge this treaty obligation in full, having disbursed only a part of the amount for the purposes named in the treaty. The plaintiff tribe is entitled to recover the undisbursed balance of $61,563.42.
Item % (finding 5), amount claimed, $150,000. — The United States agreed in article VIII of the treaty of 1856 to invest for the Seminole Nation the sum of $250,000, at five percent per annum, and to invest the further sum of $250,000 in like manner whenever the Seminóles then remaining in Florida had emigrated and joined their brethren in the west, whereupon the two sums so invested were to constitute a fund belonging to the united tribe of Seminóles, the interest on which “at the rate aforesaid, shall be annually paid over to them per capita as an annuity.”
There is no controversy as to the payment of the annuity thus provided prior to the fiscal year 1861. But beginning with that year, and up to and including the fiscal year 1866, no part of the $25,000 annually due, amounting to $150,000, was disbursed per capita to members of the tribe, although the amount due was annually appropriated by Congress for that purpose, the whole of such appropriations, together with other Seminole funds, being disbursed *148 for the relief of loyal refugee members of the Seminole and other tribes of Indians.
The plaintiff, we think, is clearly precluded from recovery as to this item of its claim by reason of the stipulations in article VIII of the treaty of 1866, heretofore set out. In comprehensive and unqualified terms the Seminole Nation ratified and confirmed “all expenditures by the United States of annuities in clothing and feeding refugee and destitute Indians since the diversion of annuities for that purpose, consequent upon the late Avar with the so-called Confederate States.” The diversions complained of had all been made when this provision was incorporated in the treaty of 1866, and the ratification and confirmation by the Seminóles of “all such diversions of annuities heretofore made” bar the plaintiff tribe from now asserting claim for the annuity payments so ratified and confirmed by it.
Item 3 (finding 6), amount claimed $1SI,5S1£8. This item is also based on the agreement of the United States in article VIII of the treaty of 1856 to pay annually to the Seminole Nation, per capita as an annuity, the $25,000 interest due on the united Seminole fund of $500,000.
The amount due under this provision of the treaty was annually appropriated by Congress for the fiscal 3''ears 1867 to 1909, inclusive. The Secretary of the Interior, however, failed to disburse certain of the amounts so appropriated, as shown in finding 6, by either making per capita payments to members of the tribe or paying the same over to the Seminole tribal treasurer, amounting in all to $154,551.28. The plaintiff concedes that payment of these funds into the Seminole tribal treasury during the fiscal years 1875 to and including the fiscal year 1898 was authorized by the act of April 15, 1874 (18 Stat. 29). Claim is made in another item, subsequently to be considered, for the payments made into the tribal treasury subsequent to the fiscal year 1898. Kecovery, therefore, under this item is sought only of the amount of the underpayments for the years named, either by direct per capita payments to members of the tribe or by payment into the tribal treasury.
The defendant says that even if the funds in question were not disbursed in strict accordance with the terms of *149 the treaty, they were expended for the benefit of the plaintiff tribe, and that no damage resulted to the tribe from the “diversion” of the funds, even if unauthorized. It is urged that if the United States be technically liable, the tribe having received the benefit of the expenditures, there arises in favor of the United States an equitable counterclaim for the same amount, which the court under section 3 of the jurisdictional act is authorized to pass upon. This contention was urged under like circumstances in The Creek Nation v. United States, supra, and was rejected by the court. Section 3 of the jurisdictional act authorizes the court to “hear, examine, consider, and adjudicate any claims which the United States may have against said Indian Nation.” “Claims” as used in the section, of course, can mean only legal claims which the United States asserts by way of counterclaim. The United States has asserted no counterclaim, hence there is no claim against the plaintiff tribe which the court is authorized to “hear, examine, consider, and adjudicate.” Even if the plaintiff received the benefit of the payments, and that fact is not established, they were payments made outside of the provisions of the treaty and as such were gratuities which the court under the jurisdictional act is without authority to offset against the plaintiff’s claim.
The treaty stipulations as to the manner and the purposes for which the annuity payments be expended were as much a part of the treaty and as binding on the United States as was the provision fixing the amount to be paid. Furthermore, section 2097 of the Revised Statutes (act of July 26, 1866, 14 Stat. 280) prohibited disbursement in any other manner:
No funds belonging to any Indian tribe with which treaty relations exist shall be applied in any manner not authorized by such treaty, or by express provisions of law; nor shall money appropriated to execute a treaty be transferred or applied to any other purpose, unless expressly authorized by law.
The United States failed to disburse the full amount of the annuity payments due the plaintiff for the years in question in the manner and for the purposes named in the *150 treaty, although the full amounts due were appropriated by Congress for that purpose. It is no defense to say, even if the fact was shown, that they were paid out for other purposes for which the tribe received the benefit.
The plaintiff is therefore entitled to recover the amount of the underpayments set forth in finding 6, $154,551.28.
Item 4 (funding 7), amount claimed, $1,790. The United States agreed in article IX of the treaty of 1856 to expend the sum of $20,000 for improvements for the Seminóles then in Florida after they had removed to the Seminole country west. Congress appropriated the $20,000 provided for in this article of the treaty but only $18,210 of the appropriation Avas expended for the purposes specified. The plaintiff is entitled to recover the undisbursed balance, $1,190.
Item 5 (finding 9), amount claimed, $90,597£0. Article III of the treaty of 1866, among other things, provided that of the balance due the Seminole Nation under the treaty, the sum of $50,000 “shall be a permanent school fund, the interest of which [five percent per annum] shall be paid annually and appropriated to the support of schools.” Congress annually, beginning with the fiscal year 1867 to and including the fiscal year 1909, appropriated the $2,500 interest due under this provision of the treaty. For the fiscal 3>-ears 1867 to 1874, inclusive, there was disbursed for school purposes from the sums so appropriated the sum of $16,902.80 only, although the amount due for that period and duly appropriated by Congress was $20,000. Beginning with the fiscal year 1875 down to and including the fiscal year 1907, the annual amount due and appropriated was paid by the Secretary of the Interior to the Seminole tribal treasurer, except that for the fiscal year 1907 only $1,750 was so paid.
The plaintiff in another item makes claim for the payments made by the Secretary of the Interior to the Seminole tribal treasurer subsequent to the fiscal year 1898. These years will therefore be eliminated in the consideration of this item, leaving only for determination the plaintiff’s right to recover the amount of the underpayments for the years 1867 to 1874, inclusive, the amounts paid to the *151 Seminole tribal treasurer for the years 1875 to 1898, inclusive, and the underpayment to the tribal treasurer for the year 1907.
Payments made by the Secretary of the Interior to the Seminole tribal treasurer of the annual interest due the plaintiff for school purposes under the treaty of 1866 were unauthorized. While the Creek Nation under the terms of the treaty of 1856 had been vested with the power to disburse certain of their tribal funds by tribal officials, and the payment of such funds was authorized to be made to the tribal treasurer for that purpose, no such provision was made in respect to the Seminole Nation in that or any subsequent treaty.
The Secretary of the Interior in a supplemental report to the Attorney General, on March 22, 1935, said in respect to these payments:
There has nothing been found in the records to show why these amounts were turned over to the Treasurer, but inasmuch as a part of the annuities was for the support of the Seminole government, and the Act of 1874 provided for a five thousand dollar appropriation for the school fund, the entire annuity under the 1856 treaty was so used. The treaty of 1866 provided for a government for the Seminole Nation and the annuities were all used for the support of such government and for the schools which were established in their country and conducted for their benefit.
The act of April 15, 1874, to which the Secretary refers in his report, conferred authority on the Commissioner of Indian Affairs, with the sanction of the Secretary of the Interior and the President of the United States, to expend annuities, interest, or other moneys then or thereafter due to the Seminole Tribe of Indians under article VIII of the treaty of 1856 “for such objects as will best promote the comfort, civilization, and improvement of the Seminole Indians” or “to pay such annuities or any part thereof into the treasury of the Seminole Nation to be used as the council of the same shall provide, instead of paying the same per capita according to the terms of said treaty.” The act further provided that the consent of the tribe “to such expenditures and payment shall be first obtained” and the agreement shall provide “that the sum of five thousand dollars shall be *152 annually appropriated out of said-annuity to the school fund of said tribe.” Since this act by its terms applied solely to “annuities, interest, or other moneys” then or thereafter to become due under article VIII of the treaty of 1856, it is clear that it did not and could not authorize the like disposition of interest due the plaintiff under the treaty of 1866. Congress at the time of the enactment knew that the interest in question was annually due the plaintiff under the terms of the treaty of 1866, and that appropriations for the same were being regularly made. Neither the act of 1874 nor any subsequent act of Congress conferred authority on the Secretary of the Interior to disburse moneys due the plaintiff tribe under the treaty of 1866 in any manner other than that provided in the treaty.
The treaty provided that the interest on the permanent school fund of $50,000 be “paid annually and appropriated to the support of schools.” Congress never authorized disbursements of this fund to be otherwise made. It follows that the plaintiff is entitled to recover the amount of the unauthorized payments to the tribal treasurer during the years 1875 to 1898, inclusive, $57,500, also the amount of the underpayments for the years 1867 to 1874, inclusive, $3,097.20, and the underpayment of $750.00 for the fiscal year 1907, amounting in all to $61,347.20.
Item 6 (finding-10), amount claimed, $15,000. This claim is for $15,000 which the third article of the treaty of 1866 provided to be paid for the erection of a mill “suitable to the needs” of the Seminole Nation. The $15,000 was appropriated by Congress and turned over to an Indian agent. He purchased a combined saw and grist mill and had it erected at the Seminole Agency. The evidence submitted does not justify a finding that the mill was not suitable to the needs of the Seminole Nation and that its erection did not discharge the defendant’s treaty obligations in that respect. The plaintiff, therefore, is not entitled to recover on this claim.
Item 7 (finding 11), amount claimed, $10,000. The United States agreed in article VI of the treaty of 1866 to cause to be constructed, at an expense not exceeding $10,000, suitable agency buildings, in consideration of which the *153 Seminole Nation relinquished and ceded to the United States one section of their lands, upon which the agency buildings should be erected. Congress in 1866 appropriated the sum of $10,000 for agency buildings provided in the treaty. None of this amount, however, was used for that purpose and the whole of the appropriation was subsequently returned to surplus. In 1872 Congress again appropriated the sum of $10,000 to replace the amount of the previous appropriation. In July 1875 the sum of $969.85 of this appropriation was returned to surplus. It is not shown for what purposes the $9,030.15 expended out of this appropriation was used, but it appears that none of it was used for the purpose of erecting agency buildings.
In the years 1870 and 1872 there was expended for “agency buildings and repairs” the sum of $931.76 out of a general appropriation for “buildings at agencies and repairs.” While these expenditures were not made out of the specific funds provided for in the treaty but from other funds of the tribe, we think the defendant is entitled to have this sum credited against its treaty obligations to erect suitable agency buildings, as the amount may reasonably be considered as having been expended for the purposes designated in the treaty. The plaintiff is entitled to recover the balance not so disbursed, $9,068.24.
Up to this point the items considered are based on the alleged failure of the United States to make payments of the sums due the plaintiff under its treaties with the United States, in the amounts and in the manner provided by such treaties. The defendant in the brief concedes that the amounts claimed were not disbursed for the purposes named in the treaties under which the claims arose, except as to the claim of $15,000 for the erection of a mill.
In determining the plaintiff’s right to recover as to these items, we have applied the rule that an Indian tribe is entitled to have the full amount due it under the terms of a treaty with the United States disbursed in the manner and for the precise purposes named in the treaty, unless Congress by subsequent legislation provides that payments be otherwise made, and that the United States is liable to *154 the tribe for the balance of any moneys not so disbursed and expended.
We now come to the consideration of the items of the claim where it is alleged disbursements of Seminole trust funds were made by the Secretary of the Interior without authority of law. In the consideration of these items the rule stated in The Creek Nation v. United States, supra, will be applied:
That Congress has plenary power over the administration of Indian affairs is well settled. Cherokee Nation v. Georgia, 5 Pet. 1; Cherokee Nation v. Hitchrock, 187 U. S. 294; Lone Wolf v. Hitchcock, 187 U. S. 553. The Secretary of the Interior has only such authority over the funds of Indian tribes as is confided in him by Congress. Pie cannot legally disburse and pay out Indian funds for purposes other than those authorized by law. This rule is the test by which the legal right of the Secretary of the Interior to make the disbursements involved must be determined.
Item 8 (-fvnding 12), amownt claimed, $86702.58. Recovery is sought under this item of payments made by the Secretary of the Interior out of the Seminole tribal funds to the Seminole tribal treasurer subsequent to the passage of the Curtis Act, June 28, 1898, aggregating the sum of $864,702.58.
Prior to the passage of the Curtis Act, the Seminole Nation and other Indians constituting the Five Civilized Tribes largely controlled their own affairs independent of the Federal Government, maintaining governments of their own, electing their principal chief and council and other tribal officers. These governments maintained courts, police, and schools, collected taxes, and under various treaty provisions and acts of Congress were entrusted with the disbursement of certain of the tribal income due them from the United States, payments of which were authorized to be made to the respective tribal treasurers. As we have seen, the act of April 15, 1874, authorized payment of certain moneys due the Seminole Nation under article VIII of the treaty of 1856 into the Seminole tribal treasury to be used as “the council of the same shall provide, instead of paying the same per capita according to the terms of the said treaty.” Also the act of March 2, 1889 (25 Stat. 980, 1004), authorized *155 payment into the Seminole tribal treasury semiannually five per cent interest on the sum of $1,500,000 remaining in the Treasury of the United States to the credit of the tribe as part of the consideration paid for the release and conveyance of certain of their lands. Under these two acts large sums due the Seminóles from the United States were paid to the Seminole tribal treasurer and disbursed by its tribal authorities according to the laws of the tribe. The same situation prevailed as to other tribes of the Five Civilized Nations.
Long before the passage of the Curtis Act, the utter inefficiency of the Indian tribal governments had been demonstrated and was universally recognized. It was also a matter of common knowledge throughout the Indian country that they were notoriously and incurably corrupt, and that every branch of the service was infested with favoritism, graft, and crookedness of every kind. The Dawes Commission, in one of its early reports to Congress (1894), in speaking of these tribal governments and the prevailing conditions existing under them, said:
Corruption of the grossest kind, openly and unblushingly practiced, has found its way into every branch of the service of the tribal governments. All branches of the governments are reeking with it, and so common has it become that no attempt at concealment is thought necessary. The governments have fallen into the hands of a few able and energetic Indian citizens, nearly all mixed blood and adopted whites, who have so administered their affairs and have enacted such laws that they are enabled to appropriate to their own exclusive use almost the entire property of the Territory of any kind that can be rendered profitable and available.
H* H* %
The large payments of moneys to the Indians of these tribes within the last few years have been attended by many and apparently well-authenticated complaints of fraud, and those making such payments, with others associated with them in the business, have, by unfair means and improper use of the advantages thus afforded them, acquired large fortunes, and in many instances private persons entitled to payments have received but little benefit therefrom. And worse still is the fact that the places of payments were thronged with evil characters of every possible caste, by whom the people were swindled, defrauded, robbed, and grossly debauched and demoralized. And in case of further *156 payments of money to them the Government should make such disbursements to the people directly, through one of its own officers.
¡1: ‡ ‡
Justice has been utterly perverted in the hands of those who have thus laid hold of the forms of its administration in this Territory and who have inflicted irreparable wrongs and outrages upon a helpless people for their own gain.
The Curtis Act and succeeding acts of Congress had for their purpose the creation of correct membership rolls of the Five Civilized Tribes, the allotment of their tribal lands in severalty, the sale of the surplus remaining lands after allotments had been made, the equalization of allotments, the per capita distribution of the remaining tribal funds,, the final winding up of tribal affairs, and the ultimate dissolution of the tribal governments. As a part of this comprehensive general program it was provided by section Iff of the Curtis Act:
That no payment of any moneys on any account whatever shall hereafter be made by the United States to any of the tribal governments or to any officer thereof for disbursement, but payments of all sums to members of said tribes shall be, made under direction of the Secretary of the Interior by an officer appointed by him; and per capita payments shall be made direct to each individual in lawful money of the United States, and the same shall not be liable to the payment of any previously contracted obligation.
The undoubted purpose of this provision was to forever put an end to the intolerable conditions brought about by permitting the tribal governments to receive and disburse tribal moneys due them from the United States. It was to prevent unscrupulous tribal officers and corrupt designing persons associated with them from diverting to their own use and profit tribal funds, the common property of the tribe,, and to insure that all members of the tribe would receive an equal share in the distribution of such funds. No more wholesome or humane provision was ever written into an Indian statute, and the Seminole Indians were entitled to its protection in the distribution of all tribal income due them from the United States. This protection, however, was not afforded them, and a continuation of the “irreparable *157 wrongs and outrages upon a helpless people” was made possible by payment thereafter of large sums of their tribal funds to the tribal treasurer.
The defendant says that section 19 of the Curtis Act was not applicable to the Seminole Nation for the reason that the agreement negotiated November 16,1897, between the United States and the Seminole Nation, approved and ratified on July 1, 1898 (30 Stat. 567), “superseded and repealed any and all provisions of the Curtis Act inconsistent therewith” and that the said agreement “did not in anywise affect the provisions of the then existing treaties between the Seminole Nation and the United States, except insofar as such provisions might be inconsistent therewith.” This contention assumes, necessarily, we think, that the right of the Seminole Nation to have moneys due it from the United States paid into the Seminole tribal treasury was secured to the tribe by then existing treaty provisions. This is not the case. No such provision is found in any treaty between the United States and the Seminole Nation. The right of the Secretary of the Interior to pay Seminole tribal funds into the tribal treasury, as well as the right of the tribal authorities to receive and disburse such funds, was purely statutory, created by the acts of April 15, 1874, and March 2, 1889, heretofore referred to. These acts were repealed by section 19 of the Curtis Act and were nonexistent when the Seminole agreement was ratified on July 1,1898. There is nothing in the agreement inconsistent with the provisions of section 19 of the Curtis Act, and the contention that the effect of the agreement was to repeal or supersede the provisions of this section is without merit.
Immediately following the passage of the Curtis Act, Hon. Willis Van Devanter, then Assistant Attorney General, now an Associate Justice of the Supreme Court, advised the Secretary of the Interior in a written opinion that section 19 of the Curtis Act applied to the Seminole Nation. The Assistant Attorney General, after reviewing various sections of the Curtis Act, and the act of July 1, 1898, said:
I have therefore to advise that section 19 of the act of June 28, 1898, applies to the Seminole Nation of Indians. *158 Moreover, it results from what has been hereinbefore said .that whether that act applies or not, the manner of disbursement under the Seminole act must be the same.
While this opinion was not controlling as to the action of the Secretary of the Interior, and was shortly thereafter withdrawn by the Assistant Attorney General for that reason, it was a correct decision of the legal question presented — a decision by an outstanding authority on the interpretation of Indian treaties and laws.
The Secretary of the Interior was therefore without legal authority to pay Seminole tribal funds into the Seminole tribal treasury. More than that he was plainly prohibited by the law from doing so. The payments being clearly illegal, the plaintiff is entitled to recover the amount shown by finding 12, which is the sum of $864,702.58.
Item, 9 (finding IS), amoimt claimed, $lS4-,fSS.S0. It was provided in the original Seminole agreement, ratified by act of Congress of July 1, 1898 (30 Stat. 567), that:
Five hundred thousand dollars ($500,000) of the funds belonging to the Seminóles, now held by the United States, shall be set apart as a permanent school fund for the education of children of the members of said tribe, and shall (be held by the United States at five percent interest, or invested so as to produce such amount of interest, which shall be, after extinguishment of tribal government, applied by the Secretary of the Interior to the support of Mekasuky and Emahaka Academies and the district schools of the Seminole people; and there shall be selected and excepted from allotment three hundred and twenty acres of land for each of said academies and eighty acres each for eight district schools in the Seminole country.
Pursuant to the foregoing provision, the sum of $500,000 was transferred from the “Seminole General Fund” and set up on the books of the United States Treasury to the credit of the Seminole Nation under the heading “Seminole School Fund.” The fund under the provisions of the agreement was to be a “permanent school fund” for the education of children of members of the Seminole tribe, the Secretary of the Interior being authorized to apply only the interest thereon for that purpose. He could not under the *159 terms of the agreement expend any part of the principal fund for education or for any other purpose.
During the fiscal years 1920 to and including 1930, the Secretary disbursed out of the principal of this fund for the purposes of per capita payments, equalization of allotments and education the sum of $154,455.30. That Congress had the power to change the terms of the agreement and authorize these payments is well established, but we find no act of Congress that either in express terms or by necessary implication authorizes any of them. It must, therefore, be held that they were illegally made and that the Seminole “permanent school fund” — a trust fund — was unlawfully depleted thereby. The plaintiff is entitled to recover the sum claimed, $154,455.30.
Item 10 (finding Ilf), amount claimed, $51,^.60.08. The Secretary of the Interior, during the fiscal years 1913 to 1928, inclusive, expended for “education” out of the tribal funds of plaintiff the sum of $51,460.08, no part of which was specifically appropriated by Congress.
Section 18 of the Indian Appropriation Act for the fiscal year beginning July 1, 1912 (31 Stat. 518), contained the following provision:
Seo. 18. Provided, That during the fiscal year ending June thirtieth, nineteen hundred and thirteen, no moneys shall be expended from the tribal funds belonging to the Five Civilized Tribes without specific appropriation by Congress, except as follows: Equalization of allotments, per capita and other payments authorized by law to individual members of the respective tribes, tribal and other Indian schools for the current fiscal year under existing law, salaries, and contingent expenses of governors, chiefs, assistant chiefs, secretaries, interpreters and mining trustees of the tribes for the current fiscal year, and attorneys for said tribes employed under contract approved by the President, under existing law, for the current fiscal year: * * *
This provision was continued in each annual appropriation act until the act of May 24, 1922 (42 Stat. 575), which act contained the following provision:
* * * Provided further, That the Secretary of the Interior is hereby authorized to continue during the ensuing *160 fiscal year the tribal and other schools among the * * * and Seminole tribes from the tribal funds of those nations, within his discretion and under such rules and regulations as he may prescribe: Provided further,, That hereafter no money shall be expended from tribal funds belonging to the Five Civilized Tribes without specific appropriation by Congress: Provided further, That for the current fiscal year money may be so expended from such tribal funds for * * * tribal and other Indian schools under existing law, * * *.
Each annual Indian appropriation act thereafter during the period covered by this item of the plaintiff’s claim contained substantially the same provision.
In The Creek Nation v. United States, supra, it was held that all payments made by the Secretary of the Interior out of the Creek tribal funds, subsequent to July 1, 1912, without specific appropriations by Congress were illegally made except such payments as fell within the exceptions enumerated in these several acts. It was also held that “disbursements for education come within the exceptions to the proviso contained in the act of August 24, 1912, and similar provisions of succeeding acts.” It is not shown that any of the payments complained of were in excess of the amount authorized to be expended for the purposes of education for the years in which they were made. We think the payments were authorized by law and that the plaintiff is not entitled to recover in respect to any of them.
Item H (finding Ilf), amount claimed $3,909.96. Congress in the Indian appropriation acts for the fiscal years 1929 and 1930, limited disbursements for Seminole funds for “education” to a total of $33,000 for each of the years. Notwithstanding this limitation, the Secretary of the Interior disbursed for “education” the sum of $34,952.25 for the fiscal j^ear 1929, and the sum of $34,957.11 for the fiscal year 1930. These excessive disbursements were made in violation of plain provisions of law and were unauthorized and illegal. The plaintiff is therefore entitled to recover the sum of $3,909.96, the amount of the illegal disbursement of its funds for the two years.
Item M (finding IS), amount claimed, $1,313.71. The Secretary of the Interior expended out of the Seminole *161 funds during the fiscal years 1913, 1914, 1915, and 1916 the sum of $4,348.74 for insurance and the construction and repair of buildings, without specific appropriation therefor by Congress. These payments were not only made without authority of law, but were made in violation of law prohibiting them. Creek Nation v. United States, supra. The plaintiff is therefore entitled to recover the sum claimed, $4,348.74.
Item IS (finding 16), amownt clai/ined, $178,533.1$. The plaintiff in the petition alleges that certain amounts are due because of errors made by the defendant in keeping the books of account of plaintiff’s funds, the amounts claimed not being stated. In its suggested findings of fact the plaintiff enumerates the alleged errors, the specific amounts claimed, and the pages on which the entries appear in the report of the General Accounting Office. The aggregate amount claimed in the suggested findings is $178,-533.42.
Careful consideration of the various book entries set forth in the suggested finding does not warrant the conclusion that they are errors in bookkeeping. In fact it appears that as to most of the items the entries were correctly made and set forth the actual disposition of the funds involved. It may be that many of the items reflect unauthorized disbursements of the plaintiff’s funds, and if so they constitute distinct claims upon which recovery could be had if established by proof. But the court is not able to find from the bare record that the entries were erroneously made on the defendant’s books. However, the defendant concedes, that certain of the entries, both in respect to the credits and debits, were erroneously made, resulting in a loss to the plaintiff of the sum of $1,350.55, which amount the plaintiff is entitled to recover.
Upon the whole case it is held that the plaintiff is entitled to recover the sum of $1,317,087.27 and a judgment for that amount is hereby awarded.
It is so ordered.
Whaley, Judge; Littleton, Judge; Geeen, Judge; and Booth, Chief Justice, concur.

 “* * * That all appropriations heretofore or hereafter made to carry into effect treaty stipulations, or otherwise, in behalf of any tribe or tribes of Indians, ali or any portion of whom shall be in a state of actual hostility to the Government of the United States, including the Cherokees, Creeks, Choctaws, Chickasaws, Seminóles, Wichitas, and other affiliated tribes, may and shall be suspended and postponed wholly or in part at and during the discretion and pleasure of the President: Provided! further, That the President is authorized to expend such part of the amount heretofore appropriated and not expended and hereinbefore appropriated for the benefit of the tribes named in the preceding proviso as he may deem necessary, for the relief and support of such individual members of said tribes as have been driven from their homes and reduced to want on account of their friendship to the Government. And an account shall be kept of the sums so paid for the benefit of such tribe, which account shall be rendered to Congress at the commencement of the next session thereof. And all purchases of articles for the purposes above set forth, shall be made on advertisement, as provided in other cases, and an account shall be rendered of all such purchases, with a statement of the prices paid therefor: And provided furthers That in cases where the tribal organization of any Indian tribe shall be in actual hostility to the United States, the President is hereby authorized, by proclamation, to declare all treaties with such tribe to be abrogated by such tribe, if, in his opinion, the same can be done consistently with good faith and legal and national obligations.”