Findings of fact under Seo. 161, Judicial Code. — -Torts are neither legal nor equitable claims within the meaning of section 151, Judicial Code.
Same. — An agreement to protect Indians in the possession of their homes is not a promise to pay the tribe for loss of lives or property of individual Indians, and a claim for losses for failure to protect is neither legal nor equitable within the purview of Sec. 151, Judicial Code.
Same; jurisdiction. — The general jurisdiction of the Court of Claims does not extend to claims growing out of treaties with the Indians, but the court has jurisdiction to make findings of fact concerning such claims under a proper reference by Congress.
The Reporter's statement of the case:
The following are the statement, findings of fact and conclusion announced by the court:
STATEMENT.
This is a claim consisting of a number of items sets forth in the following statement:
On February 21, 1911, Senate bill No. 10830 of the Sixty-first Congress was referred to this court by resolution of the *2 United States Senate, under provisions of law, a of fact and report thereon. The section of the bill which relates to this case reads as follows:
“ That the sum of three hundred thousand dollars is hereby appropriated to pay all claims, of whatsoever nature, which the Pawnee Tribe of Indians may have or claim to have against the United States for the amount due or claimed to be due said tribe from the United States under any treaties or laws of Congress, or for the misappropriation of any funds of the said tribe, or for the failure of the United States to pay the tribe any money due.”
The claimant thereafter appeared in this court and filed a petition on the 3d day of October, 1913, in which it is alleged in substance that the Pawnee Tribe of Indians had treaty relations with the United States, and was then and still is under the control and guardianship of the United States; that the plaintiff tribe resides in the State of Oklahoma, and its members occupy lands in severalty; that it formerly held in common certain lands (a part of which they now hold in severalty) acquired from the Cherokee and Creek Tribes; that prior to this the plaintiff held by treaty with the United States certain land in the State of Nebraska; that a treaty was concluded between the United States and the Pawnee Tribe of Indians, dated October 9, 1833 (7 Stat., 418), under the provisions of which the petition sets forth several items of claim, as follows:
(1) Por the balance of annuities under Article III of the treaty, $311.87, alleged to be still due said tribe.
(2) For the sum of $28,641.55, appropriated for the purchase of agricultural implements under Article IV, and diverted to other purposes.
The facts as to these items are set out in Finding I.
*3 That on September 24, 1857, the plaintiff entered into a treaty with the United States (11 Stat., 729) under which the following items of the claim are set forth in the petition:
(a) Claim for $79,496.97, alleged to have been appropriated under Article IV for the employment of farmers, blacksmiths, apprentices, millers, and engineers, and the erection of a steam mill, and not so expended. The facts as to this item are contained in Finding III.
(Z>) Claim for $29,960, alleged to have been appropriated under Article IV for the employment of farmers, blacksmiths, apprentices, millers, and engineers, and the erection of a steam mill, and not so expended. The facts as to this item are contained in Finding III.
(o) Claim for $53,750 as damages alleged for failure to protect the lives of members of the plaintiff tribe and their property, as required by Article- IV of said treaty. The facts as to this item are contained in Finding IV.
(d) Claim for $8,000 as damages alleged for frauds perpetrated on the plaintiff by their agent in furnishing supplies to the tribe. The facts as to this item are set out in Finding V.
(e) Claim for $36,000 as the value of the Pawnee school, farm, and agency buildings on the reservation of tribe in Nebraska, reserved from sale when the said reservation was sold. The facts as to this item are set out in Finding VI.
(/) Claim for $315,781.49 for surplus lands of the reservation in Oklahoma after allotment in severalty, ceded to the United States by the Jerome agreement, and interest at 5 per centum to July 1, 1920. The facts as to this item are set out in Finding VII.
This case having been heard by the Court of Claims, the court, upon the evidence, makes the following
FINDINGS OE FACT.
By Article III, to pay to the said bands annually for 12 years the sum of $4,600 in goods. Congress duly appropriated therefor the total sum of $55,200. Of this amount $54,888.13 was expended as provided by the treaty. The balance, $311.87, was credited to the tribe on overpayments of annuities under the subsequent treaty of September 24, 1857.
By Article IY, to pay to each of said bands $500 (in agricultural implements) annually for five years (a total of $10,000), “to be continued longer if the President thinks proper.” In fulfillment of this obligation Congress appropriated annually for five years the stipulated sum, in all, $10,000; and, on the recommendation of the President, appropriated up to and including the year 1858 an additional $32,000. Out of the total amount of these appropriations the sum of $13,358.45 was expended for the benefit of the plaintiff tribe as stipulated in the treaty, being $3,358.45 in excess of the actual obligation of the United States under said treaty. Acting under authority of the act of Congress of August 26, 1842 (5 Stats., 533), the President directed the transfer of $8,902, of the total amount appropriated, to supply deficiencies in other items in the Indian Office; and under authority of the act of Congress of March 3, 1843 (id., 613), directed the transfer of $3,176.27 to adjust accounts of disbursing officers. The sum of $14,846.59 was covered into the surplus fund; and the balance of the total appropriation, to wit, $1,716.69, was used under the treaty of September 24, 1857, for the purchase of agricultural implements for said Indians.
By Article Y, to allow $1,000 a year for 10 years “for schools to be established for the benefit of said four bands at the discretion of the President.” Commencing with the year 1834 Congress appropriated annually for 10 years the stipulated sum, and in 1844 appropriated an additional $500, making a total appropriation of $10,500. The President directed no expenditures out of the' sums appropriated until the year 1843, and from that date until the year 1853 a total of *5 $4,689.92 was expended upon the education of the Pawnee Tribe. Out of the balance remaining the President directed the transfer of $3,000 under the act of March 3, 1843 (5 Stats., 613); and the balance, $2,810.18, was covered into the surplus fund.
By Article VI, to furnish two blacksmiths and two strikers with shops, tools, and iron for 10 years at an expense not exceeding $2,000 annually. Congress appropriated the maximum sum yearly for 10 years, and in 1844 appropriated an additional $1,000, making a total appropriation of $21,000. Out of the amount thus appropriated $15,504.83 were used to fulfill the obligations of this article of the treaty; and of the balance of $5,495.17 the sum of $3,127.87 was transferred under the act of March 3, 1843 (5 Stats., 613), and the remainder, $2,367.30, covered into the surplus fund.
By article VII, to furnish each of said four tribes with a farmer for five years and to deliver to said farmers for the benefit of the nation $1,000 value in oxen and other stock. “ But said stock is not to be delivered * * * until the President thinks the same can be done with propriety and safety.” No claim is made by the plaintiff tribe under this article.
Articles XI and XII provided for the expenditure of certain sums for the benefit of the plaintiff tribe, which sums were appropriated and expended as provided. The amount appropriated under Article XI was erroneously charged against the funds of the Omaha Indians.
The said treaty further provided by Article X that—
“ It is agreed and understood that the United States shall not be bound to fulfill the stipulations contained in the fifth, seventh, and eighth articles until said tribes shall locate themselves in convenient agricultural districts, and remain in these districts the whole year, so as to give protection to the teachers, the farmers, stock, and mill.”
The evidence is silent as to whether or not the plaintiff tribe complied with the requirements of this article.
*6 By Article XII of the treaty of September 24, 1857 (11 Stats., 729), between the United States and the plaintiff tribe of Indians it was provided—
And the Pawnees hereby relinquish all claims they may have against the United States under former treaty stipulations.
II. By treaty of September 24, 1857 (11 Stat., 729), the Pawnee Tribe ceded to the United States all its lands north of the Platte River except a defined tract 30 by 15 miles in extent, the lands ceded embracing a large part of the State of Nebraska north of the Platte River and extending from the Omaha Indian lands on the east to the Niobrara River on the north and as far west at least as the junction of the Niobrara and Keyapaha Rivers. In return the United States, among other things, agreed to establish two, and if advisable four, manual-labor schools for the use and benefit of the Pawnees, and to furnish suitable houses, farms, and other necessaries to their successful operation, and not less than $5,000 per year to the support of each school, the President, if at any time satisfied the Pawnees-were not in good faith keeping their children in school, to have the discretion to “ discontinue the schools in whole or in part.” The United States in 1862, five years after the treaty, established one school, and in 1864 it began erection of a manual-training school building, which was completed the following year. This school was reported by the Indian agent in 1870 to be insufficient to • accommodate all the Pawnee children desiring to attend, and they called attention to the failure to comply with the terms of the treaty. Congress in 1872 made an appropriation for an additional schoolhouse, but it was not erected up to the year 1873-74, when the Pawnees moved from Nebraska to Oklahoma. From 1858 to 1914, inclusive, Congress appropriated for the education of the Pawnee Tribe; under Article III of the treaty, a total of $820,900,- of which $761,506.81 were expended on the education of the said Indians, an average yearly expenditure' of $13,359.77. The balance, $59,393.19, was at various times and. in different amounts covered into *7 the surplus fund during this period. The sum of $5,102.78, transferred from use under Article III of the treaty, was expended for annuities to plaintiff Indians in 1876 in addition to the amounts appropriated for that purpose.
III. As one of the other considerations for the land cession made by the Pawnees in 1857 the United States by Article IY of the treaty of 1857 agreed to furnish annually and perpetually to the Pawnees two blacksmiths, two apprentices, a farmer, a steam mill, to be kept in repair for 10 years, and a miller and an engineer for 10 years or longer, at the discretion of the’ President. The United States each year recognized the foregoing as a continuing obligation, and the President never exercised his discretion to discontinue the miller and engineer after 10 years. Congress annually ’appropriated $4,580 up to and including 1869 for these employees as treaty obligations, and in 1883 and thereafter the amount annually appropriated was $5,400. The Indian Office, without the consent of the Pawnees, in the years 1908, 1909, 1910, and 1911 expended the moneys so appropriated for clerks, a mechanic, and a laborer at the Pawnee Agency in lieu of the employees named in the treaty. In 1912 the Indian Office secured the consent of the Pawnee Tribe for future use of the appropriation in the employment of clerks. For the four years during which the appropriations were so used by the Indian Office without plaintiff’s consent the amount expended was $15,240. To pay the farmer, miller, and engineer specified in Article IY during this four-year period would have required $9,600, leaving as the amount diverted to other purposes $5,640, which, with interest at 5 per cent from July 1, 1913, makes a total to July 1, 1920, of $7,614.
From September 1, 1869, to January 10, 1871, a period of 16 months, the then Pawnee Indian agent paid $50 a month, or $800 in all, to a 14-year-old son of the engineer at the mill as miller, though performing and being able to perform little service as such.
Under Article IV of the treaty of 1857 the United States agreed to furnish a farmer, miller, and engineer for 10 *8 years, after which it was left to the discretion of the President whether these employees should be continued.
The treaty further provided in the fourth clause of Article IY:
“Whenever the President shall become satisfied that the Pawnees have sufficiently advanced in the acquirement of a practical knowledge of the arts and pursuits to which this article relates, then, and in that case, he may turn over the property to the tribe and dispense with the services of any or all employees herein named.”
The United States bound itself, without considering amounts left to the discretion of the. President, to pay the plaintiff Indians the sum of $2,472,670 and expended for the benefit of said Indians the sum of $2,706,874.28.
IY. By Article IY of the said treaty of September 4, 1857, it was provided: “ The United States agree to protect the Pawnees in the possession of their new homes.”
The Pawnees continued loyal to the United States and furnished many scouts to the United States Army during the Civil War and afterwards. The Sioux repeatedly attacked the Pawnees and murdered a number of them while on their reservation. The Pawnees made a- number of requests for protection to their agents and to the Government at Washington. They requested that troops be sent to protect them as provided in the treaty, and also that arms be furnished them so that they might protect themselves. The Indian agents on several occasions called attention to the foregoing article of the treaty, but protection was not afforded except on one or two occasions and' to a very limited extent. Adequate protection was not provided and arms were not furnished the tribe. The evidence shows that from 1860 to 1875 about.51 members of the tribe — men, women, and children — were killed, 152 ponies stolen, and 60 mud lodges destroyed.
In 1873 Congress appropriated $9,000 for the Pawnee Tribe on account of the massacre of 69 Pawnees, the loss of 100 ponies, 800 buffalo hides, and the meat taken in their hunt while off their reservation. The evidence does not show to the satisfaction of the court the value to the tribe *9 of the lives of the members killed or of the property stolen or destroyed.
Y. After the removal of the Pawnee Tribe to the Indian Territory the act of April 10, 1876 (19 Stat., 28), was approved, authorizing the sale of the Pawnee Agency in Nebraska and providing, among other things, for the purchase of immediate supplies for said Indians. In a telegram of April 5, 1876, the Commissioner of Indian Affairs advised the Indian agent in charge of the Pawnees that the Pawnee relief bill had passed, and directed him to purchase supplies absolutely necessary for immediate use in limited quantities, in open market, not exceeding $10,000. Following the purchase of supplies for the relief of the said Indians, charges of fraud in the delivery of supplies at the Pawnee Agency were made. The charges were investigated by a board of inquiry, which, in its report of February 18,1878, stated there was some evidence to sustain the charges. The United States attorney for the district of Kansas was furnished with a copy of the report and the Indian agent was indicted. The case was afterwards investigated by a special assistant to the district attorney and finally a nolle prosequi was entered by the United States. There is some competent testimony to show that beef unfit for use was furnished to said Indians, but the quantity and cost have not been shown. Outside of this meager and unsatisfactory testimony, there is no competent testimony to establish any frauds charged against the Indian agent.
YI. The Pawnee Tribe by the treaty of 1857, in consideration of their cession of all claim to a large part of the State of Nebraska, over which they roamed and hunted and to which they had the usual Indian title, were given by the United States a tract of land on the north side of the Platte River, described by natural boundaries, for a reservation, which included the present limits of the town of Genoa, Nebr. This tract was 30 miles from east to west by 15 miles from north to south. The United States recognized this tract as a reservation for the Pawnee Tribe, to be held by usual Indian title of occupancy. April 10, 1876, Congress, with the consent of plaintiff Indians, passed an act (19 Stat., 28) *10 “ to authorize the sale of the Pawnee Reservation.” The purpose of the act was to provide for the removal of the Pawnees from Nebraska to Oklahoma and the Indian country in that Territory, as it then was. The act provided that the lands should not be sold for less than their appraised value, or less than $2.50 per acre, and further .provided that if any tracts should contain valuable improvements thereon, made by or for the Indians or for Government purposes, said improvements might be sold separately from the lands on which they were situated or with the land, as the Secretary of the Interior might deem best. The act further provided that any surplus that might remain from the proceeds of the sale of the lands, after reimbursing the United States for certain advances, etc., should be placed tp the credit of the Indians in the Treasury Department and bear interest at a rate not to exceed 5 per cent per annum. There was a tract of land with the improvements on it which contained 160 acres and formed part of the reservation of the plaintiff Indians. The United States by act of Congress (22 Stat., 68, 85), without the consent of the Indians, reserved this 160-acre tract from sale. It used the land and buildings for the purpose of education of Indians of other tribes, chiefly Sioux, Arapahoes, and Winnebagoes, with whom the' Pawnees were in hostility. Since the removal of the Pawnees from Nebraska in 1876 no Pawnee has ever been educated in this school. The appraised value of this 160 acres was $6 per acre, and by act of Congress approved March 3, 1883 (27 Stats., 612, 620), $960 was appropriated to reimburse the plaintiff tribe for this appraised value of the 160-acre tract.
*11 YII. By the act of April 10, 1876 (10 Stats., 28), Congress provided for the sale of the Pawnee Reservation in Nebraska and for the removal of said Indians to a reservation set apart for them by the fourth section of the act between the Cimarron and Arkansas Rivers, in the Indian Territory, 280,014.04 acres of which formed part of the lands of the Cherokee Nation and 53,005.94 acres of which had been ceded to the United States by the Creek Nation by the treaty of June 14, 1866 (2 Kapp., 931),
On November 23, 1892, a commission appointed pursuant to an act of Congress and known as the Jerome Commission, negotiated an agreement with the Pawnee Tribe (1 Kapp., 498), by the terms of which the said tribe ceded to the United States the reservation set apart for them by the above-mentioned act of April 10, 1876. In consideration of this cession the members of the tribe were to receive allotments in severalty in the said reservation and by Article IY, “as an additional and only further consideration for such cession and conveyance, the United States agrees to pay to said tribe the sum of one dollar and twenty-five cents per acre for all the surplus land in said reservation, after the allotments herein provided for shall have been taken and approved by the Secretary of the Interior, payable as follows: Eighty thousand dollars in coin, to be distributed among them per capita at the subagency on said reservation upon the ratification of this agreement by Congress, and the residue of the proceeds of said surplus lands shall be placed to the credit of said tribe in the Treasury of the United States, and bear interest at the rate of five per centum per annum, there to remain at the discretion of the United States, the interest to be paid annually and be distributed to said tribe *12 per capita on said reservation.” The agreement is contained in the message of the President communicating same to Congress, known as Executive Document No. 16, second session, Fifty-second Congress (see 27 Stat., 644; 1 Kapp., 498.)
This agreement provided that existing treaty stipulations should continue, except as modified therein, and that said agreement should become effective when ratified by Congress, and on March 3,1893, Congress passed an act (27 Stat., 612, 644) ratifying and confirming said agreement, the material provisions of which provide:
“ SectioN 12. That the sum of eighty thousand dollars, or so much thereof as may be necessary, is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the same to be immediately available, to pay the Pawnee Tribe of Indians in Oklahoma, formerly a part of the Indian Territory, for all their right, title, claim, and interest of every kind and character in and to all that tract of country” (describing the Pawnee Reservation) “conveyed and relinquished to the United States ” by the Jerome agreement, “ to be paid and applied in the manner provided in article four of said agreement.” * * * “ Said agreement is hereby accepted, ratified, and confirmed. 'And the residue of the proceeds of the surplus lands mentioned in said agreement shall be placed to the credit of said tribe in the Treasury of the United States, and shall bear interest at the rate of five per centum per annum, said interest to be paid and distributed to said tribe as provided in said article four.
“ Section 13. That the lands acquired by the agreements specified in the two preceding sections are hereby declared to be a part of the public domain. Sections sixteen and thirty-six in said township, whether surveyed or unsurveyed, are hereby reserved from settlement for the use and benefit of public schools, as provided in section ten relating to lands acquired from the Cherokee Nation of Indians. And the lands so acquired by the agreements specified in the two preceding sections not so reserved shall be opened to settlement by proclamation of the President at the same time and in the manner and subject to the same conditions and regulations provided in section ten relating to the opening of the lands acquired from the Cherokee Nation of Indians. And each settler on the lands so to be opened as aforesaid shall, before receiving a patent for his homestead, pay to the United States for the lands so taken by him, in addition to the fees provided by law, the sum of two dollars and fifty cents per acre; and *13 shall also pay interest upon the amount so to be paid for said land from the date of entry to the date of final payment at the rate of four per centum per annum.”
Under the above act $80,000 were paid to said Indians and distributed in coin to the individual members of the tribe, and allotments were made to each member, aggregating 111,-931.61 acres, leaving 171,088.37 acres of surplus lands, of which 755 acres were reserved for school and agency purposes and continues as tribal property, and the balance, 170,333.37 acres, was disposed of by the United States, 142,826.99 acres patented to homesteaders under the free-homestead act, and 6,729.80 acres were paid for at $2.50 per acre by settlers, and the residue granted to the State of Oklahoma as school lands.
The amount agreed to be paid to the tribe by the Jerome Commission for the surplus lands — 170,333.37 acres, at $1.25 per acre — was $212,916.71, which less $80,000 heretofore paid; would leave $132,916.71, the interest on which from March 3, 1893, to September 3, 1920, at 5 per cent per annum, would amount to $6,645.83 annually, or a total interest for 27 years 6 months of $182,760.32. Neither this principal sum nor any of this interest has been paid.
Upon the foregoing facts the Court of Claims states its conclusions in accordance with section 151, Judicial Code, as follows:
1. The several items of claim made under provisions of the treaty of 1833 (numbered 1, 2, 3, 4, and 5 in the preceding statement) do not constitute claims legal or equitable against the United States. See Finding No. I, and provision of Article X of the treaty of 1833, quoted in Finding I, and also the stipulation of Article XII of the treaty óf Í857, also quoted in Finding I.
2. The several items of claim made under provisions of the treaty of 1857 (numbered a, b, d, and e in the preceding statement) do not constitute legal or equitable claims against the United States. If there had been shown diversion of funds by agents, there would be no legal liability upon'the Government therefor. Whether anything should be paid rests entirely in the discretion of the Congress.
*14 Two of the claims set forth in the preceding statement (c and /, respectively) were insisted upon the argument before the court. That marked “ c ” is predicated upon an alleged failure of the United States to afford protection under the provision of the treaty of 1857 in Article IY thereof, as follows :
“ The United States agree to protect the Pawnees in the possession of their new homes.”
The claim is for members of the tribe killed, for lodges destroyed and ponies captured, and for other property taken, all by hostile Indians.
As shown by Finding IY, Congress appropriated in 1878 for this character of losses. The clause in the treaty does not extend to an agreement to indemnify the tribe for. such acts and losses as are set forth. See Leighton ease, 161 U. S., 291, 296; Blaehfeather case, 37 C. Cls., 233, 190 U. S., 368; Omaha Tribe v. United States, 253 U. S., 275.
“ It is a promisé on the part of the tribe to keep the peace and not a promise to pay if the peace is not kept.”
The bill referred to the .court is for claims of the tribe, and not claims for individual members thereof. See comments in Supreme Court’s opinion in Blaehfeather ease, 190 U. S., 368, 375.
The finding shows that there is no evidence upon which the value of the lives of the Indians that were killed can be predicated. See similar finding by Court of Claims in Omaha Tribe v. United States, 53 C. Cls., 549, 558, and the court’s conclusion thereon, affirmed by Supreme Court (253 U. S., 275, sufra). This claim is not a legal or equitable one against the United States.
The claim marked is for the proceeds of surplus lands mentioned in the Jerome agreement (see Finding YII). The Pawnees owned a reservation in Indian Territory (Oklahoma); a part of it was allotted in severalty to
*15 members of the tribe; and the balance was ceded to the United States under the Jerome agreement, ratified by act March 8, 1893 (27 Stat., 612, secs. 12 and 13), for which the United States agreed to pay $1.25 per acre. These surplus lands acquired by the United States (and declared to be part of the public domain by section 13 of said act, 27 Stat., 612) comprised 170,333.37 acres, which, at the price named, would produce $212,916.71. The act' appropriated $80,000, which was paid, leaving a balance of $132,916.71 on the basis stated. The act provides that the amount shall be placed in the Treasury and bear interest at 5 per cent per annum. See reference to the agreement in the ratifying act (27 Stat., 644). This principal sum of $132,916.71, at 5 per cent per annum, would produce annually $6,645.83. Computing this interest from the date of the ratifying act, March 3, 1893, would make for the period March 3, 1893, to September 3, 1920 (27 years and 6 months), $182,860.32 interest.
Neither this principal sum of $132,916.71 nor any interest thereon has been paid. A just claim is thus presented under the terms of said agreement, the payment of which rests in the judgment of Congress.
The jurisdiction of the Court of Claims does not extend to claims growing out of treaties with Indians (sec. 153, Judicial Code).