The PEORIA TRIBE OF INDIANS OF
OKLAHOMA et al.

v.

The UNITED STATES.

No. 8–65.

United States Court of Claims.

Dec. 16, 1966.

Jack Joseph, attorney of record, for appellants, Louis L. Rochmes, Washington, D. C., of counsel.

Craig A. Decker, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for appellee, Ralph A. Barney, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

## OPINION

COWEN, Chief Judge.

The Peoria Tribe seeks review of two adverse portions of a decision of the Indian Claims Commission which was generally favorable to the tribe. Two separate issues are involved on the appeal. The first concerns the payment given the Indians in place of certain annuities which they relinquished in 1854. Before that year, the Weas and the Piankeshaws were the beneficiaries of permanent annuities coming to $3,800 per year. By the Treaty of May 30, 1854, 10 Stat. 1082, these groups joined with others to form the single Peoria Tribe (see The Peoria Tribe of Indians of Oklahoma v. United States, 169 Ct.Cl. 1009 (1965)), and all agreed to give up those annuities (Art. 6). "[I]n consideration of the relinquishments and releases aforesaid", the United States agreed to pay the united tribe a total of $66,000 in six installments from 1854 to 1859, "and also to furnish said tribe with an interpreter and a blacksmith for five years, and supply the smith shop with iron, steel, and tools, for a like period."[1] The Indian Claims Commission found that the United States actually paid a total of

---

1. Article 6 provided: "The said Kaskaskias and Peorias, and the said Piankeshaws and Weas, have now, by virtue of the stipulations of former treaties, permanent annuities amounting in all to three thousand eight hundred dollars per annum, which they hereby relinquished and release, and from the further payment of which they forever absolve the United States; and they also release and discharge the United States from all claims or damages of every kind by reason of the non-fulfilment of former treaty stipulations, or of injuries to or losses of stock or other property by the wrongful acts of citizens of the United States; and in consideration of the relinquishments and releases aforesaid, the United States agree to pay to said united tribe, under the direction of the President, the sum of sixty-six thousand dollars, in six annual instalments, as follows: In the month of October, in each of the years one thousand eight hundred and fifty-four, one thousand

$70,820 in discharge of these obligations, and appellants do not now contest that figure. The Commission then found that the commuted value, as of 1854, of the released annuities (computed at a 5 percent interest rate) would be $76,000. Appellants also agree with this conclusion. But the Commission refused to award the tribe the difference between $76,000 and $70,820 (i. e., $5,180), ruling that the consideration paid was not unconscionable even though it fell short by $5,180 of the true value of the released annuities. Appellants urge that this was error, and that they are entitled to a judgment for the $5,180.

We agree with the Commission that in the circumstances the payment of $70,820 for annuities worth $76,000 did not represent an unconscionable consideration, or indicate something less than fair and honorable dealings. The amount ultimately paid was 93 percent of the full value. This is a small discrepancy, both in percent and in absolute figures. Moreover, as the Commission pointed out, the consideration, according to the treaty, was to be $66,000 in cash plus the supplying of certain goods and services for 5 years; "it may well have been that the United States anticipated that the materials and services would amount to $10,000.00 thereby requiring the total of $76,000.00 to satisfy the obligations under Article 6." 11 Ind.Cl.Comm. 171, 178 (1962). At the time of the signing of the treaty this would have been a reasonable forecast, and it is proper to assess the worth of the consideration at that date rather than upon the basis of what may actually have occurred during the ensuing 5-year period from 1854 to 1859.

The Miami Tribe of Oklahoma v. United States, 281 F.2d 202, 211–212, 150 Ct.Cl. 725, 740–742 (1960), cert. denied, 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961), does not require reversal of the Commission's determination. The court held that the consideration for a commuted annuity must be adequate, but in that instance the United States paid only 78 percent of the value and the difference in monetary terms was the large sum of $118,136.50; in addition, Miami Tribe did not have the factor of promised supplies and services which could reasonably be valued, prospectively, as making up the difference.

Nez Perce Tribe of Indians v. United States, 176 Ct.Cl. (July 1966), is distinguishable on comparable grounds. The court's opinion points out the significantly different elements supporting that claim: a minimum discrepancy of 33⅓ percent depriving the claimant of at least $566,045.77, with a consequent probable loss of interest of $200,000, thus raising the minimum discrepancy to about 50 per cent—a large figure. The court carefully declared that it was not departing from the rule that, before a price disparity can be labeled unconscionable, it must be "very gross". In the present case we cannot call the small disparity "gross", let alone "very gross".

The second claim involves another provision of the 1854 treaty. Under Article 4, 10 Stat. 1083, the Federal Government agreed to sell some land owned by the Indians in Kansas at public auction, and "to pay to the said Indians, as hereinafter provided, all the moneys arising from the sales of said lands after deducting therefrom the actual cost of surveying, managing, and selling the same". The Commission held that the United States breached these obligations by allowing white "settlers" to buy the lands at an appraised price, rather than selling the property in a freely competitive market at higher levels. The difference between the appraised values and the fair market value was found to be $172,726.04,

---

eight hundred and fifty-five, and one thousand eight hundred and fifty-six, the sum of thirteen thousand dollars, and in the same month in each of the years one thousand eight hundred and fifty-seven, one thousand eight hundred and fifty-

eight, and one thousand eight hundred and fifty-nine, nine thousand dollars, and also to furnish said tribe with an interpreter and a blacksmith for five years, and supply the smith shop with iron, steel, and tools, for a like period."

and recovery was ordered in that amount.[2] Neither side questions this figure. The appellants urge, however, that the Commission erred in refusing to grant interest on this award from 1857 to the date of payment.

Appellants concede that the Government, absent its consent, has always been immune from an obligation to pay interest. "The right to claim and recover interest from the United States is purely a matter of grace * * *." Richmond, F. & P. R. R. Co. v. United States, 95 Ct.Cl. 244, 259 (1942). The recovery of interest must be expressly provided for in a statute, treaty, or contract. Moreover, the consent necessary to waive governmental immunity from interest "must be affirmative, clear-cut, and unambiguous". United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 590, 67 S.Ct. 398, 91 L.Ed. 521 (1947). As the Supreme Court stated in United States v. New York Rayon Importing Co., 329 U.S. 654, 659, 67 S.Ct. 601, 604, 91 L.Ed. 577 (1947):

> [T]here can be no consent by implication or by use of ambiguous language. Nor can an intent on the part of the framers of a statute or contract to permit the recovery of interest suffice where the intent is not translated into affirmative statutory or contractual terms. The consent necessary to waive the traditional immunity must be express, and it must be strictly construed.

See also United States v. Alcea Band of Tillamooks, 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738 (1951); Cherokee Nation v. United States, 270 U.S. 476, 46 S.Ct. 428, 70 L.Ed. 694 (1926).[3]

There is no contention that there was a constitutional taking of appellants' land. However, more than 100 years after the treaty was entered into and on the basis of a statute enacted many years later, the Indian Claims Commission determined that appellants are entitled to $172,726.04, an additional sum that would have been paid for the Indian lands if the Government had not breached its agreement to sell the lands at public auction. As a result of these events, appellants maintain that if the additional proceeds now determined to be due had been realized when the lands were sold, the language of the 1854 treaty would have required the United States to pay interest on the $172,726.04 and, therefore, that they are now entitled to such interest. The claim is based only on that portion of Article 7 of the 1854 treaty which reads:

> And as the amount of the annual receipts from the sales of their lands, cannot now be ascertained, it is agreed that the President *may*, from time to time, and upon consultation with said Indians, determine how much of the net proceeds of said sales shall be paid them, and how much shall be invested in safe and profitable stocks, the interest. The claim is based solely on that portion of Article 7 of the 1854 treaty which reads:

> Whether we consider the foregoing language of the treaty separately and apart from the remainder of that document or whether we construe it in con-

---

2. The Commission found the fair market value of the land to have been $2.50 per acre in June–July 1857 (the time of sale). Since 207,758.85 acres were involved, the tribe should have received $519,397.13. The sum it actually received was $346,671.09. The difference is $172,726.04.

3. For an example of how strictly such a waiver of immunity has been construed, see Anglin & Stevenson v. United States, 160 F.2d 670 (10th Cir. 1947), cert. denied, 331 U.S. 834, 67 S.Ct. 1514, 91 L.Ed.

1847 (1947), in which Rule 25 of the Circuit Court, in conformity with the related statute and having the force of law, provided that when a lower court judgment is affirmed "interest thereon shall be calculated and levied from the date of the judgment * * *." Id. at 672. The court held that this allowance of interest did not apply to a judgment against the United States, since Congress had not *expressly* consented to the payment of interest by the United States. Cf. Nez Perce Tribe of Indians v. United States, supra, slip op. pp. 12–13.

nection with other articles of the treaty, we arrive inescapably at the same conclusion: Article 7 of the treaty conferred discretion upon the President to invest the proceeds or not, as he saw fit. There is neither agreement nor consent by the United States to pay interest upon the proceeds.

The word "may" in Article 7 denotes that the signatories to the treaty vested in the President the discretion to pursue alternative courses of action. He could pay the proceeds directly to the Indians; he could *invest* them in "safe and profitable stocks"; or he could do both. There is no mandate that the President act in a single specified manner, and nowhere in the entire treaty may there be found an explicit promise by the Government to pay interest.[4]

When we turn to other provisions of the same treaty, it is apparent that the framers of the treaty knew how to impose a duty or to express a promise, and for such purposes they used clear and explicit language such as "shall"[5] and "agree".[6] The framers also knew how to confer discretion; and when particular powers or actions called for discretion, the treaty spoke in terms of "may".[7] Thus the parties to the treaty knew how to express an "affirmative, clear-cut" obligation. United States v. Thayer-West Point Hotel Co., supra. They did not do so in Article 7 concerning disposition of the proceeds.[8]

In pressing their claim for interest, appellants rely mainly upon the decision of the Supreme Court in United States v. Blackfeather, 155 U.S. 180, 15 S.Ct. 64, 39 L.Ed. 114 (1894). However, an examination of that decision demon-strates quite clearly that the treaty there considered contained a direct and unequivocal promise by the United States to pay five percent per annum on the proceeds of the sale of Indian lands. In the seventh article of the treaty before the Supreme Court in that case, it was agreed that the proceeds of the sale of Indian lands, after certain deductions had been made, "shall constitute a fund for the future necessities of said tribe, parties to this compact, *on which the United States agree to pay to the chiefs, for the use and general benefit of their people, annually, five per centum on the amount of said balance, as an annuity*". [Emphasis supplied.] 155 U.S. at 188, 15 S.Ct. at 67. Although the promise of the United States to pay five percent annually on the fund was denominated in the treaty as an annuity, the Supreme Court held that the unqualified promise of the United States to pay an annuity of five percent was substantially the same as an agreement to pay interest in the same amount. That decision cannot be made to fit the case at bar, because in the treaty involved here there was no equivalent affirmative obligation to pay the Indians interest or to make any other type of payment on the proceeds of the sale of their lands, no matter how such payment may be denominated.

Mille Lac Band of Chippewas v. United States, 47 Ct.Cl. 415 (1912), rev'd, 229 U.S. 498, 33 S.Ct. 811, 57 L.Ed. 1299 (1913), which is also relied upon by appellants, is equally inapplicable, because that case arose under the Act of January 14, 1889, 25 Stat. 642, which expressly provided for the payment of interest at the rate of five percent per

---

4. Such a promise cannot, of course, be implied. United States v. New York Rayon Importing Co., supra.

5. See, e. g., Articles 3, 4, and 5.

6. See Article 6.

7. See, e. g., Articles 3, 4, 9, and 11.

8. Therefore, we do not consider appellants' argument that Congress in the years immediately preceding the signing of the treaty construed a *promise* to invest in safe and profitable stocks as equivalent to a promise by the United States to pay interest on the sum to be "invested". Our concern here is solely with what the United States obligated itself to do; and as shown above, the United States did not even obligate itself to invest the proceeds. To invest or not was discretionary; hence, even if we were to find the claimed equivalency, we could find no *promise* to pay interest.

annum on sums received from the sale of the Indian lands. 47 Ct.Cl. at 462.

 In summary, the 1854 treaty clearly specified that the disposition of the proceeds of the land sales was left to the discretion of the President. Therefore, it would be judicial treaty-writing for us to read into that agreement an express promise by the Government to pay interest.[9]

For the reasons stated above, we hold that appellants are not entitled to prevail on either of the issues raised in this appeal, and we therefore affirm the determinations of the Indian Claims Commission.

Affirmed.

DAVIS, Judge (concurring in part and dissenting in part):

I join in the court's opinion on the first claim, but dissent from the disposition of the demand for interest on the $172,762.04 awarded by the Indian Claims Commission.

The sole ground for this claim is Article 7 of the 1854 Treaty, 10 Stat. 1084, which provided:

And as the amount of the annual receipts from the sales of their lands, cannot now be ascertained, it is agreed that the President may, from time to time, and upon consultation with said Indians, determine how much of the net proceeds of said sales shall be paid them, and how much shall be invested in safe and profitable stocks, the interest to be annually paid to them, or expended for their benefit and improvement.

It is agreed that if this is read as containing an express provision for interest appellants can recover, otherwise not.

See United States v. Alcea Band of Tillamooks, 341 U.S. 48, 49, 71 S.Ct. 552, 95 L.Ed. 738 (1951); Confederated Salish and Kootenai Tribes v. United States, 175 Ct.Cl. (May 13, 1966), cert. denied, Oct. 24, 1966, 385 U.S. 921, 87 S.Ct. 228. It is also settled that the mere fact that the United States did not pay the additional $172,000 in the 1850's, as it should have, would not, in itself, bar the Tribe from now collecting interest to which it would otherwise be entitled. See United States v. Blackfeather, 155 U.S. 180, 192, 15 S.Ct. 64 (1894); Mille Lac Band of Chippewa Indians in State of Minn. v. United States, 51 Ct. Cl. 400, 407–408 (1916); Pawnee Tribe of Indians v. United States, 56 Ct.Cl. 1, 15 (1920); Menominee Tribe of Indians v. United States, 67 F.Supp. 972, 975, 107 Ct.Cl. 23, 33 (1946); Nez Perce Tribe v. United States, 176 Ct.Cl. (July 15, 1966). These decisions show that, if the treaty had said in precise terms that the sums received from the sales should be deposited in the treasury at interest, there would be no question that appellants' position was correct. The issue for us is whether the actual words of the agreement gave the Peoria Tribe the same right to interest.

In resolving this question, we must remember that Indian treaties "are not to be interpreted narrowly, as sometimes may be writings expressed in words of art employed by conveyancers, but are to be construed in the sense in which naturally the Indians would understand them." United States v. Shoshone Tribe, 304 U.S. 111, 116, 58 S.Ct. 794, 797, 82 L.Ed. 1213 (1938). "[T]hey are to be construed, so far as possible, in the sense in which the Indians understood them, and 'in a spirit which generously

---

**9.** Admittedly no interest is allowable for the breach of an obligation to pay over money to the Indians. Confederated Salish and Kootenai Tribes v. United States, 175 Ct.Cl. (May 1966), cert. denied, 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145, and Ramsey v. United States, 101 F.Supp. 353, 121 Ct.Cl. 426, 431–432 (1951), cert. denied, 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952). Any argument

that the President was implicitly precluded from paying over more than was necessary to maintain the reasonable wants of the Indians is without merit. If such a limitation had been desired, it would have been expressly so provided in the treaty. Cf. Treaty with the Delawares, May 6, 1854, Art. 7, 10 Stat. 1048, 1050.

recognizes the full obligation of this nation to protect the interests of a dependent people.' Tulee v. State of Washington, 315 U.S. 681, 684–685 [62 S.Ct. 862, 86 L.Ed. 1115]." Choctaw Nation of Indians v. United States, 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943).[1]

The 1854 treaty contemplated that the proceeds of the land sales would either be paid to the Indians, from time to time, or be invested by the Government so as to bear fruit.[2] There are two problems with the phrasing. The first is that the directive to invest referred to "safe and profitable *stocks*", with "the *interest*" to be paid over to or expended for the Tribe (emphasis added). To borrow the language of the Supreme Court in the *Blackfeather* case, supra, 155 U.S. at 192, 15 S.Ct. at 69, "while this is not literally an agreement to pay interest, it has substantially that effect". In *Blackfeather* the provision was in the form of an annuity measured by five percent on the Indians' money, but the Court looked through this shell to see that the treaty-parties intended the Indians to receive the normal proceeds from their funds. Here the treaty refers to "stocks" and "interest" from those stocks, but it seems clear that the signatories likewise desired the Indians to receive the increment normally earned (if they were not to have the money in their own hands). For some years before this 1854 treaty, the Federal Government construed similar agreements calling for investment in "safe and profitable stocks" yielding "interest" of not less than five per cent as being satisfied by an appropriation, from year to year, of a sum equal to five per cent interest. See Annual Report of the Commissioner of Indian Affairs, Nov. 30, 1852, p. 10 (H.Doc. 1, pp. 300–01); Annual Report of the Commissioner of Indian Affairs, 1853, pp. 10–12 (H.Doc. 1, p. 263).[3] The only change in the 1854 treaty was the deletion of the specific reference to five per cent; the reason for this change seems to have been the wish to assure the Indians the possibility of a greater amount obtainable from private investments, not to cut off the Indians' right to the fair proceeds of their moneys which were retained by the Government and not handed over to them. Ibid. That right was preserved.

The other problem—the one with which the court's opinion treats—arises from the possibility that the President might have immediately turned over the whole $172,000 to the Indians, if it had been paid in 1857, without retaining any for investment.[4] This is, of course, a theoretical possibility, but it seems very unlikely as a practical matter. The President would not hand over to these dependent Indians more than they needed

---

1. The Supreme Court has often indicated that, where possible, such treaties are to be interpreted liberally in favor of the Indians. See The Kansas Indians, 5 Wall. (72 U.S.) 737, 760, 18 L.Ed. 667 (1866); Choctaw Nation v. United States, 119 U.S. 1, 27–28, 7 S.Ct. 75, 30 L.Ed. 306 (1886); Jones v. Meehan, 175 U.S. 1, 11, 20 S.Ct. 1, 44 L.Ed. 49 (1899); State of Minnesota v. Hitchcock, 185 U.S. 373, 396, 22 S.Ct. 650, 46 L.Ed. 954 (1902); United States v. Winans, 198 U.S. 371, 380–381, 25 S.Ct. 662, 49 L.Ed. 1089 (1905).

2. It would be wholly inadmissible, in my view, to read the treaty as permitting the President simply to retain the money in the treasury without interest, instead of turning it over to the Indians or investing it. The court does not suggest that the President had this do-nothing option, which undoubtedly would have contravened the Indians' understanding.

3. In recommending that such appropriations no longer be made but that the principal be invested, the Commissioner of Indian Affairs said that the prior practice had "failed to execute" the treaty stipulations, but it is clear to me from the context that he was complaining of the costly drain on the treasury of the practice of continually appropriating the interest without any money coming into the treasury through investment of the principal, and that he well understood the past practice to be in substitution for the payment of the proceeds of investment. He thought, too, that the Indians would be advantaged by investing the money.

4. See footnote 2, supra.

or could properly use for day-to-day expenses; nor could the Tribe expect to receive more than this. The comparable article of a contemporaneous treaty with the Delawares, 10 Stat. 1048, 1050 (1854), says expressly that the amounts to be paid over were to meet "current wants" and "reasonable wants",[5] and the Peoria Treaty would probably be interpreted in the same way. Thus, the President's discretion was not at large, but was to be exercised in consultation with the Indians and according to the standard of their need. On that basis, it is most unlikely that the large sum of $172,000 would have been paid over rather than invested. Only a minimum of speculation is needed, in my opinion, to find that the money would have borne fruit if the United States had accounted for it in the 1850's.

The Treaty's use of "may", rather than "shall", should not be given the weight the court puts on it to show the unlimited character of the President's discretion. This was not a carefully-drawn business contract between equals or even a Congressional enactment, but an Indian treaty. "[F]riendly and dependent Indians are likely to accept without discriminating scrutiny the terms proposed." United States v. Shoshone Tribe, supra, 304 U.S. at 116, 58 S.Ct. at 797. "[T]he treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." Jones v. Meehan, supra, 175 U.S. at 11, 20 S.Ct. at 5. To the Peoria Tribe, Article 7 would have meant the same if it had said that the President "shall", instead of "may", determine the way the funds were to be allocated. Their understanding, as I judge it, was that the monies turned over to them would be enough to satisfy their current wants, and the rest was to be invested for profit, with the increment accruing to their benefit. That was "the substance of the right, without regard to technical rules." United States v. Winans, supra, 198 U.S. at 381, 25 S.Ct. at 664.

The Supreme Court's decision in Blackfeather, supra, 155 U.S. at 188, 192–193, 15 S.Ct. 64, 69, supports, I think, this practical and non-technical reading of the appellants' treaty. In that case the agreement calling for a five percent "annuity" on a fund composed of proceeds of Indian land sales provided further that the fund was to continue " 'during the pleasure of congress, unless the chiefs of the said tribes, or band, by and with the consent of their people, in general council assembled, should desire that the fund thus to be created, should be dissolved and paid over to them; in which case the president shall cause the same to be so paid, if in his discretion, he shall believe the happiness and prosperity of said tribe would be promoted thereby." Under this stipulation the fund was dissolved and paid over in 1852. But when the Supreme Court agreed in 1894 with this court that judgment should be entered against the United States for certain sums not credited the Indians at the time of the sale (in 1840), the Court ruled that interest on that amount should be paid, not only until 1852, but until the judgment was paid (sometime after 1894). "If the government had originally accounted for the whole amount for which the court below held it to be liable, it would have paid five per cent. upon this amount until the whole fund was paid over. The fund as to this amount

5. Article 7 of the Delaware treaty provided: "it is expected that the amount of moneys arising from the sales herein provided for, will be greater than the Delawares will need to meet their current wants; and as it is their duty, and their desire also, to create a permanent fund for the benefit of the Delaware people, it is agreed that all the money not necessary for the reasonable wants of the people, shall from time to time be invested by the President of the United States, in safe and profitable stocks, the principal to remain unimpaired, and the interest to be applied annually for the civilization, education, and religious culture of the Delaware people, and such other objects of a beneficial character, as in his judgment, are proper and necessary."

being not yet distributed, the obligation to pay the five per cent. annuity continues until the money is paid over." 155 U.S. at 193, 15 S.Ct. at 69. This, I take it, was a refusal to hold that the Indians were barred from collecting interest from 1852 to 1894 because they could not prove that the omitted sum would not have been distributed in 1852 along with the other monies. Similarly, in the present case, the appellant Tribe, which did not in fact receive the $172,000 in the 1850's, should not be precluded from obtaining interest because it cannot prove conclusively that that sum would have been invested, rather than paid over at once, if the United States had sold the lands at public auction as it should have.

To construe the 1854 Treaty as providing for interest would not conflict with any decision of this court. In Confederated Salish and Kootenai Tribes v. United States, supra, 175 Ct.Cl. (May 13, 1966), cert. denied, Oct. 24, 1966, 385 U.S. 921, 87 S.Ct. 228, the opinion assumed that a statute requiring deposit in the treasury of "all sums received on account of sales of Indian trust lands", and declaring that interest was to be paid on these deposits, would have applied to monies improperly withheld from the Indians, if it were not for a later act partially modifying the earlier legislation. In Nez Perce Tribe v. United States, supra, 176 Ct.Cl. (July 15, 1966), the particular treaty specified a precise sum to bear interest ($1,000,000), and "did not make the trust open-ended. * * * The Agreement here specified a sum to bear interest, and that sum apparently was paid and did bear interest; the sum claimed here is over and above the amount specified in the Agreement. In short, the Agreement has reference only to the amount that was actually agreed upon [i. e., $1,626,222] and gives no warrant for reading in a requirement that any sum determined in the future to be the fair market value should bear interest." The present

treaty, in contrast, is open-ended in its terms; it covers, not a specified sum, but all the net proceeds and receipts from the sales. The $172,000 represents a major part of the proceeds which should have been set apart for the Tribe and invested.[6]

DURFEE, Judge, joins in the foregoing opinion concurring in part and dissenting in part.

---

6. It is irrelevant that an award of interest, pursuant to the 1854 treaty, could increase the award to plaintiff by five or six times. If the treaty so provides, we cannot refuse interest because the amount is relatively large.